**Rose CIPOLLONE and Antonio Cipollone, Plaintiffs,**

v.

**LIGGETT GROUP, INC., Philip Morris Incorporated, and Loew's Theatres, Inc., Defendants.**

Civ. A. No. 83–2864.

United States District Court, D. New Jersey.

Sept. 20, 1984.

---

Myron J. Bromberg, Marc Z. Edell, Porzio, Bromberg & Newman, Morristown, N.J., Alan M. Darnell, Wilentz, Goldman & Spitzer, Woodbridge, N.J., for plaintiffs.

Raymond F. Drozdowski, Brown, Connery, Kulp, Wille, Purnell & Greene, Camden, N.J., for defendant Philip Morris.

Charles J. Walsh, Barry L. Shapiro, Marc S. Klein, Sills, Beck, Cummis, Zuckerman, Radin & Tischman, Newark, N.J., for defendant Loew's Theatres, Inc.

Paul A. Rowe, Alan S. Naar, Greenbaum, Rowe, Smith, Raven, Davis & Bergstein, Newark, N.J., for defendant Liggett Group, Inc.

## OPINION

SAROKIN, District Judge.

### INTRODUCTION

Despite the growing evidence that cigarette smoking is indeed hazardous to one's health, as recognized in the warning mandated by Congress, a legislative decision has been reached not to prohibit it. Although that decision may be due in some measure to the ongoing medical dispute as to the risks involved, it is predicated to a large extent on economic considerations and the apparent willingness of millions of persons to continue smoking despite the known and unknown risks. Congress, in order to avoid another Prohibition, has decided to permit the manufacture and sale of cigarettes to continue, but has attempted to assuage its critics by regulating the industry and requiring it to affix a warning to each package sold.

The legislative history of the Act here involved reflects a candid concern for the economy of the entire country if cigarette manufacturing were curtailed or eliminated. One would hope that those fiscal considerations were weighed against the costs of illness and death caused by cigarette smoking as well as the moral responsibility of protecting the young and future generations who have not yet begun to smoke.

In any event, that branch of the government which is charged with the responsibility of protecting the health and welfare of our society has determined that the cigarette industry shall be permitted to flourish after consideration of the consequences of permitting it to do so. This case presents the issue of whether cigarette manufacturers can be subjected to tort liability, if they have complied with the federal warning requirement: "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health." In effect, the cigarette industry argues that such compliance immunizes it from liability to anyone who has chosen to smoke cigarettes notwithstanding the warning, that the federal legislation has created an irrebutable presumption that the risk of injury has been assumed by the consumer. This court rejects that contention.

The clear purpose of the federal legislation was to establish a uniform warning which would prevail throughout the country. By so doing, cigarette manufacturers would not be subjected to varying requirements from state to state. However, the existence of the present federally mandated warning does not prevent an individual from claiming that the risks of smoking are greater than the warning indicates, and that therefore such warning is inadequate. The court recognizes that it will be extremely difficult for a plaintiff to prove that the present warning is inadequate to inform of the dangers, whatever they may be. However, the difficulty of proof cannot preclude the opportunity to be heard, and affording that opportunity will not undermine the purposes of the Act.

Defendants' argument that the statute was intended to foreclose such claims is not borne out by either the language or legislative history of the Act. Simply stated, defendants contend that a cigarette manufacturer who utilizes the federal warning cannot be held liable in tort. Just as simply, that statement could have been incorporated into the statute, if that were the intention, but it was not. Before this court or any other court so cavalierly rejects fundamental principles of the common law,

it should demand a much more definitive statement from Congress.

The information regarding disease from smoking is growing. Medical and scientific opinion is divided. The impact on the economy is a factor considered by Congress and may well have caused a compromise in the content of the warning. Even Congress, which once declared that cigarette smoking "may be" hazardous, now finds that it "is" hazardous. This court believes that an individual injured while the warning was that cigarette smoking "may be hazardous to your health" would have been able to prevail if he or she was able to prove that "cigarette smoking is [was] hazardous to your health." Today even some greater warning may be appropriate, and variations are now being considered. In any event, no one should be deprived by virtue of congressional compromise of the opportunity of proving that contention absent a clear showing that Congress intended that they be so precluded.

There are further claims asserted by plaintiff which likewise deserve their day in court. Thus, even if utilizing the federal warning relieves cigarette manufacturers of liability for failure to warn, the question remains whether they can be held liable for collateral efforts to neutralize or negate the effects of the warning. Efforts to convince the public that the risks do not exist or that they are minimal or unsupported by medical or scientific data may in and of themselves give rise to a cause of action; indeed they may even constitute a violation of the very statute which defendants brandish as a shield. Whether the present federally mandated warning is adequate and whether defendants have wrongfully attempted to neutralize that warning are thus issues which survive the federal statute and are not preempted by it.

Certainly, as in all such cases, the federal standard is strong evidence of the adequacy of the warning, but it is not conclusive. The federal government regulates many industries, not least of which is the ethical drug industry. The fact that the

safety, efficacy, literature and warnings pertaining to drugs are reviewed and approved by the government pursuant to the authority of Congress has never relieved drug manufacturers of liability in tort if the risks exceeded the warnings given. These cases, among others, recognize that even the federal government is fallible. The fact that it finds a product safe or a warning adequate does not necessarily make it so. The private citizen should not be deprived of the opportunity to establish such fallibility and vindicate his or her rights to recover for injuries sustained if supported by competent proofs.

## THE COMPLAINT

Plaintiff Rose Cipollone is dying of lung cancer. She brings this products liability action against three cigarette companies, alleging that they are responsible for her current state. Her fourteen-count complaint sounds in strict liability (Counts 2, 3 and 9), negligence (Counts 4 and 5), intentional tort (Counts 6 and 8) and breach of warranty (Count 7). She claims that defendants have produced an unsafe and defective product (Counts 2 and 7), the risk of which outweighs its utility (Count 2), but have negligently (Count 4) or intentionally (Count 8) failed adequately to warn consumers of the hazards associated with cigarette smoking. *See also* Count 3 (strict liability for failure to warn). Indeed, she contends, defendants have negligently (Count 5) or intentionally (Count 6) advertised their products so as to neutralize and render ineffective those warnings actually given, warnings which are made meaningless in any event by the addictive qualities of cigarettes (Count 9).[1]

Defendants have each answered, asserting as an affirmative defense, *inter alia,* that plaintiff's claims are preempted by the Federal Cigarette Labeling Act, as amended by the Public Health Cigarette Smoking Act, 15 U.S.C. § 1331 *et seq.* Plaintiff has moved to strike such defense. With the

cross-motion of defendant Loew's Theatres, Inc. for judgment on the pleadings, the parties are now before the court on this difficult issue.

*The Act*

*The Federal Cigarette Labeling and Advertising Act*

Originally enacted in 1965, the Federal Cigarette Labeling and Advertising Act ("the Act") followed a report of the Surgeon General of the United States concluding that cigarette smoking comprised a significant health hazard to Americans, warranting remedial action by Congress. As amended in 1970, the Act sets forth the following statement of policy:

> It is the policy of the Congress, and the purpose of this chapter, to establish a comprehensive federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—
>
> (1) the public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes; and
>
> (2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, non-uniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health.

15 U.S.C. § 1331. In order to effectuate these purposes, Congress provided that

> It shall be unlawful for any person to manufacture, import, or package for sale or distribution within the United States any cigarettes the package of which fails to bear the following statement: "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health." Such statement shall be located in a conspicuous place on every cigarette package, and

---

**1.** Counts 10 through 13 contain allegations concerning the identities of various defendants. Count 14 comprises plaintiff Antonio Cipol-

lone's claim for "loss of comfort, companionship and consortium ...."

shall appear in conspicuous and legible type in contrast by typograph, layout, or color with other printed matter on the package.

15 U.S.C. § 1333. The Federal Trade Commission was given the authority to regulate cigarette advertising, 15 U.S.C. §§ 1335–36, and the district courts jurisdiction to enjoin violations of the Act. 15 U.S.C. § 1339. A minimal criminal penalty was also provided. 15 U.S.C. § 1338.

Congress included within the Act a provision regarding preemption, and it is this provision which is now before the court for interpretation and application. Congress stated:

> (a) No statement relating to smoking and health, other than the statement required by section 1333 of this title, shall be required on any cigarette package.
>
> (b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labelled in conformity with the provisions of this chapter.

15 U.S.C. § 1334. Plaintiff concedes that this section prohibits states from regulating cigarette packaging, and cigarette advertising by, for example, requiring a warning other than that set forth in the Act. She argues, however, that this provision does not preempt state common law claims such as those asserted by plaintiff.

*Preemption*

"The Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, cl. 2. From this simple mandate springs the doctrine of preemption, as first stated by Chief Justice Marshall in *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824):

> The nullity of any act, inconsistent with the Constitution, is produced by the dec-

laration, that the Constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties, is to such acts of the state legislatures as do not transcend their powers, but though enacted in the execution of acknowledged state powers, interfere with, or are contrary to, the laws of Congress, made in pursuance of the Constitution, or some treaty made under the authority of the United States. In every case, the act of Congress, or the treaty, is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it.

22 U.S. at 210–11. *See also Fidelity Federal Savings & Loan Ass'n. v. De La Cuesta*, 458 U.S. 141, 152, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (preemption doctrine has its roots in the Supremacy Clause of the Constitution).

From *Gibbons v. Ogden* on, courts have struggled with the question of whether federal law preempts state action. The problem is "largely one of statutory construction," and therefore "cannot be reduced to general formulas." L. Tribe, *American Constitutional Law* at 377 (1978). However, certain principles are clear. First, federal law may *expressly* preempt state law. *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission*, 461 U.S. 190, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983), citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Absent express preemption, federal law may nonetheless have an implied preemptive effect if Congress so intended, and indicated such intent by "occupying the field" in a particular area. Thus

> Congress' intent to supercede state law altogether may be found from a "scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room to supplement it," "because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of

state laws on the same subject," or because "the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose." *Fidelity Federal Savings & Loan Ass'n v. De La Cuesta, supra,* 458 U.S. at 153, 102 S.Ct. at 3022; *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *cited in Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, supra,* 103 S.Ct. at 1722. And, even if Congress has not entirely displaced state regulation over the matter in question, state law may nonetheless be preempted to the extent that it actually conflicts with the federal law. Such conflict occurs where "compliance with both federal and state regulations is a physical possibility," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). *See generally Silkwood v. Kerr-McGee Corp.,* — U.S. —, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984); *Pacific Gas & Electric Co., supra,* 103 S.Ct. at 1722; *Fidelity Federal Saving & Loan Ass'n, supra,* 458 U.S. at 153, 102 S.Ct. at 3022. Together, these principles seek to accommodate the competing interests engendered by appropriate national regulation and the legitimate exercise of state power. Underlying any discussion of preemption, therefore, is the structural foundation of a federal system, in which state and federal regulation must co-exist. The preservation of that system requires a presumption "that Congress did not intend to displace state law", *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2129, 68 L.Ed.2d 576 (1981), quoting *Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at 230, 67 S.Ct. at 1152; "preemption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.' " *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 634, 101 S.Ct. 2946, 2962, 69 L.Ed.2d 884 (1981), quoting *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981); *Florida Lime & Avocado Growers, supra,* 373 U.S. at 142, 83 S.Ct. at 1217. Moreover, state law should be suspended "only to the extent of actual conflict with the scheme of federal regulation." *In re Quanta Resources Corp.,* 739 F.2d 912 at 915 (3d Cir.1984), citing *Stellwagen v. Clum,* 245 U.S. 605, 613, 38 S.Ct. 215, 217, 62 L.Ed. 507 (1918).

Here, the preemption issues arises in the context of a claim that the Federal Cigarette Labeling Act preempts the state common law claims asserted by plaintiff. There is no question, as defendants argue, that common law is as susceptible of preemption as are state statutes or regulations for, as the Supreme Court has stated,

> regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be a potent method of governing conduct and controlling policy. Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme.

*San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959).[2] *See also Sperry v. Florida,* 373 U.S. 379, 403, 83 S.Ct. 1322, 1335, 10 L.Ed.2d 428 (1963) ("The authority of Congress is no less when the state power it displaces would otherwise

---

**2.** It should be noted that the *Garmon* case did not involve the preemption of state common law claims, since the state courts had relied on various state statutory provisions in reaching the applicable decisions. *359 U.S. at 239, 79 S.Ct. at 776.*

have been exercised by the state judiciary rather than by the state legislature.") Hence, courts have held that federal statutes have preempted state common law claims in many areas. *See, e.g., Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 582–84, 101 S.Ct. 2925, 2932–33, 69 L.Ed.2d 856 (1981) (Natural Gas Act preempts calculation of damages under state common law of contract); *Kalo Brick, supra*, 450 U.S. at 317–32, 101 S.Ct. at 1130–37 (Interstate Commerce Act regulation of abandonment of service preempts state tort claim); *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 270–73, 94 S.Ct. 2770, 2774–75, 41 L.Ed.2d 745 (1974) (NLRA preempts certain state libel claims); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229–33, 84 S.Ct. 784, 787–89, 11 L.Ed.2d 661 (1964) (federal patent and copyright laws preempt state actions for unfair competition, at least in part); *Hodges v. Atchison, Topeka & Santa Fe Railway Co.*, 728 F.2d 414, 416–17 (10th Cir.1984) (Railway Labor Act preempts state common law claim for wrongful discharge); *Harper & Row Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 199–201 (2d Cir.1983) (Copyright Act preempts state common law claims for conversion and interference with contract); *Howard v. Uniroyal, Inc.*, 719 F.2d 1552 (11th Cir.1983) (Rehabilitation Act of 1973 preempts state contract claim); *Viestenz v. Fleming Companies, Inc.*, 681 F.2d 699, 701–04 (10th Cir.), *cert. denied*, 459 U.S. 972, 103 S.Ct. 303, 74 L.Ed.2d 284 (1982) (National Labor Relations Act preempts state actions for wrongful discharge and intentional infliction of emotional distress arising out of labor context); *Hasbrouck v. Sheet Metal Workers Local 232*, 586 F.2d 691, 694 (9th Cir.1978) (National Labor Relations Act preempts state claims of defamation and business disparagement); *City of Chicago v. General Motors Corp.*, 467 F.2d 1262, 1265 (7th Cir.1972) (National Emissions Standard Act preempts state products liability based upon automobile pollution); *Zittrouer v. Uarco Inc. Group Benefit Plan*, 582 F.Supp. 1471, 1477 (N.D. Ga.1984) (ERISA preempts state tort claim for bad faith handling of benefits claim);

*Delisi v. United Parcel Service, Inc.*, 580 F.Supp. 1572 (ERISA and NLRA preempt state common law claim for wrongful discharge); *Salcedo v. Norfolk & Western Railway Co.*, 572 F.Supp. 286, 288 (E.D. Mich.1982) (Railway Labor Act preempts state law claims for emotional distress and intentional interference with contractual relations); *Videotronics, Inc. v. Bend Electronics*, 564 F.Supp. 1471, 1476–77 (D.Nev. 1983) (Copyright Act preempts state common law claims of misappropriation and trade secret violations); *Shaw v. International Ass'n of Machinists & Aerospace Workers Pension Fund*, 563 F.Supp. 653, 658–59 (C.D.Calif.1983) (ERISA preempts certain state common law claims for breach of contract), citing *Lafferty v. Solar Turbines International*, 666 F.2d 408 (9th Cir. 1982); *Huth v. B.P. Oil, Inc.*, 555 F.Supp. 191, 194 (D.Md.1983) (Petroleum Marketing Practices Act preempts conflicting state common law claims), citing, *e.g., Meyer v. Amerada Hess Corp.*, 541 F.Supp. 321, 332 (D.N.J.1982) (same); *State of North Dakota v. Merchants National Bank and Trust Co.*, 466 F.Supp. 953 (D.N.D.1979) (federal banking law preempts state common law of unfair competition). *See also City of Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (federal statute preempts federal common law). However, there remains a presumption against the preemption of state common law, in particular, since such law is often the result of many generations of judicial development, *see, e.g., Iconco v. Jensen Construction Co.*, 622 F.2d 1291, 1296 (8th Cir.1980), and, more importantly, concerns areas "traditionally regarded as within the scope of state superintendence." *Florida Avocado Growers v. Paul, supra*, 373 U.S. at 144, 83 S.Ct. at 1218. *See also Pacific Gas & Electric Co., supra*, 103 S.Ct. at 1723, quoting *Rice v. Santa Fe Elevator Corp., supra*, 331 U.S. at 230, 67 S.Ct. at 1152 ("Congress legislated here in a field which the States have traditionally occupied ... so we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."); *Milwaukee v. Illi-*

*nois, supra,* 451 U.S. at 316–17, 101 S.Ct. at 1792, citing *Jones v. Rath Packing Co.,* 430 U.S. at 525, 97 S.Ct. at 1309. *See generally* Tribe, *supra,* § 6–25 at 385–86. Torts, such as those alleged here, are precisely the sort of legal action that falls within the scope of a state's historical and prototypical powers. *See, e.g., Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529, 1542 (D.C.Cir.1984); *Feldman v. Lederle Laboratories,* 97 N.J. 429, 462, 479 A.2d 374 (Sup.Ct. of N.J. 1984).[3] The presumption against preemption of these causes of action is strengthened where preemption would leave a putative plaintiff without adequate remedy for violation of his or her state created rights. *See Silkwood v. Kerr-McGee Corp., supra,* 104 S.Ct. at 626. *See also id.* at 629 ("it is inconceivable that Congress intended to leave victims with no remedy at all") (Blackmun, J., dissenting). However, any application of these principles inevitably requires the interpretation of a statute. *See* Note, *Preemption as a Preferential Ground: A New Canon of Construction,* 12 Stanf.L.Rev. 208, 208–210 (1959). It is to such interpretation that the court now turns.

## DISCUSSION

### A. *Express Preemption*

The court first addresses the question of whether the common law causes of action here asserted by plaintiff are expressly preempted by the Act. Congress has preempted certain state action by the terms of 15 U.S.C. § 1334, which is entitled "Preemption," and does not allow any "statement relating to smoking and health, other than the statement required by Section 1333 ..." to be *"required* on any cigarette package." 15 U.S.C. § 1334(a) (emphasis added). It likewise does not permit any *"requirement or prohibition* based on smoking or health" to be "imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this chapter." 15 U.S.C. § 1334(b) (emphasis added). Indeed, plaintiff concedes that the Act "precludes state and government *regulation* of labeling and advertising." Plaintiff's Brief (2/24/84) at 4. *See also Id.* at 8, 18, 29. Nonetheless, she argues that her claims, should they succeed, will not constitute regulation of cigarette labeling or advertising, but merely compensation for the harmful effects of smoking and thus, that they are not preempted. In support of this argument is the language of the statute, which does not, in so many words, prohibit suits against cigarette companies based upon state common law. Plaintiff argues, and the court agrees, that had Congress wished to extinguish state causes of action, it could easily have done so.

---

**3.** The cases involving labor law are instructive on this point. Generally, labor relations are a federal concern, and state laws conflicting with the NLRA are preempted. *See, e.g., San Diego Building Trades Council v. Garmon, supra,* 359 U.S. at 239–45, 79 S.Ct. at 776–79. However, the Supreme Court has carefully tailored the resulting preemption doctrine to take cognizance of the activities in which states have a "compelling ... interest," *id.* at 247, 79 S.Ct. at 781, or which concern matters "so deeply rooted in local feeling or responsibility that, in the absence of compelling Congressional direction, we could not infer that Congress had deprived *the States* of the power to act." *Id.* at 244, 79 S.Ct. at 779. Hence, for example, the Court has carved out exceptions to the general preemption doctrine for "conduct marked by violence and imminent threats to the public order," *id.* at 247, 79 S.Ct. at 781 (citing cases) for certain defamation actions, *Old Dominion Branch No. 496, National Ass'n of Letter Carriers, supra,* 418 U.S. at 271–

73, 94 S.Ct. 2770 at 2774–75, 41 L.Ed.2d 745, citing *Linn v. Plant Guard Workers,* 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (allowing state defamation actions to the extent that published statements are made with knowledge of their falsity or reckless disregard for the truth), for actions for intentional infliction of emotion distress, *Farmer v. United Brotherhood of Carpenters & Joiners of America, Local 25,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), and for trespass actions. *Sears, Roebuck & Co. v. San Diego County District Council of Carpenters,* 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978). In each of these cases, the Court found the conduct addressed by state law to be beyond the scope of the NLRA, and thus of only peripheral concern to federal purposes, to be of a deeply felt concern of the states, and to pose little risk of state interference with the Act. *See, e.g., Farmer, supra,* 430 U.S. at 298, 97 S.Ct. at 1062.

Defendants contend that, as state tort law has a clear regulatory effect, it falls within the language of § 1334, and indeed might well act so as to undermine the Act's purposes of creating uniformity of effective cigarette labeling and advertising, and of assuring the continued viability of the tobacco industry. Like plaintiff, defendants argue based upon what does not appear in the Act, stating that had Congress wished to allow state common law causes of action to survive, it would have included a savings clause. Indeed, defendants complement their superb briefing with a thorough Appendix, including examples of fifty such clauses appearing in federal acts.

■ The court, however, is persuaded that, on its face, the Act does not explicitly preempt state common law claims, and that determination of the question of whether preemption was intended requires an analysis of the legislative history of the Act. It is true, as defendants argue, that Congress could have included a savings clause within the Act, as it did, for example, in the Occupational Safety and Health Act of 1970, 29 U.S.C. § 653(b)(4). It did not. Nor, however, did Congress explicitly include state common law within the Act's preemption provision, as it did, for example, in the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144(c)(1).[4] The question is thus not one that can be resolved through examining the expansiveness of the preemption provision of the Act, on its face.[5]

4. ERISA's preemption clause states that
Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title ...
29 U.S.C. § 1144(a). Later, it makes clear that
For purposes of this section:
(1) The term "State law" includes all laws, *decisions*, rules, regulations, or other State action having the effect of law, of any State
....
29 U.S.C. § 1144(c)(1) (emphasis added). *See generally Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1214–16 (8th Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). Similar provisions, specifically preempting state common law appear in other statutes as well, pertaining to both substantive, *see, e.g.,* 12 U.S.C. §§ 1715z–17(d), 1715z–18(c); 12 U.S.C. § 2259; 17 U.S.C. § 301(a); 25 U.S.C. §§ 1723(a)(1), 1753(d) (preemption of common law fraud claims only), and procedural provisions. *See, e.g.* 5 U.S.C. §§ 7118(a)(6), 8124(b)(2); 22 U.S.C. § 4116(f); 33 U.S.C. § 923(a); 42 U.S.C. § 1988 (state common law procedures may be used in criminal cases to the extent consistent with the Constitution and laws of the United States). *See also* 25 U.S.C. § 1722(d) (defining "laws of the State" as including common law for purposes of the Maine Indian Claims Settlement Act of 1980). Hence, it is clear that, just as Congress could easily have provided a savings clause, so could it easily have explicitly preempted state common law. Indeed, in certain cases it did both. *See, e.g.,* 17 U.S.C. § 301; 25 U.S.C. §§ 1723(a)(1), 1753(d). Here, it did neither.
Moreover, to argue from the non-existence of a savings clause is not particularly persuasive, and flies in the face of the principle that "a statute should not be considered in derogation of the common law unless it expressly so states or the result is imperatively required from the nature of the enactment." *Bauers v. Heisel*, 361 F.2d 581, 587 (3d Cir.1966) (*en banc*), *cert. denied*, 386 U.S. 1021, 87 S.Ct. 1367, 18 L.Ed.2d 457 (1967). *See also Checkrite Petroleum, Inc. v. Amoco Oil Co.*, 678 F.2d 5, 8 (2d Cir.1982) (citing cases). Indeed, one scholar has pointed out that the proper negative inference in cases such as these is precisely the opposite of that which defendants seek to have the court draw: "Because statutes in derogation of the common law are disfavored, the maxim [of *expressio unius est exclusio alterius*] has been extensively employed to *avoid* repeal of the common law ...." Sands, 2A *Sutherland Statutory Construction* § 47.24, at 128 (1973) (emphasis added).

5. Indeed, even where savings clauses appear, they have often been narrowly construed so as to effectuate the purposes of a particular congressional enactment. *See, e.g., People of the State of Illinois v. City of Milwaukee*, 731 F.2d 403, 413–14 (7th Cir.1984) (narrowly construing savings clause in Federal Water Pollution Control Act); *American Progressive Life and Health Insurance Co. of New York v. Corcoran*, 715 F.2d 784, 786–87 (2d Cir.1983) (narrowly construing savings clause regarding insurance in ERISA); *Ventura County v. Gulf Oil Corp.*, 601 F.2d 1080, 1084 (9th Cir.1979) (narrowly construing savings clause in Mineral Lands Leasing Act); *Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1274–81 (5th Cir.1978) (narrowly construing jurisdictional savings clause in Securities Exchange Act of 1934); *National Ass'n of Regulatory Utilities Commissioners of Coleman*, 542 F.2d 11, 13–15 (3d Cir.1976) (narrowly construing savings clause in Federal Railroad Safety Act). *See also Head v. New Mexico Board of*

Nor does the court find it sufficiently clear that state tort law is encompassed within the terms "requirement or prohibition" utilized in § 1334 to be *expressly* preempted by the Act. Whether or not the effect of such New Jersey tort law is a conflict with the Act rendering such state law *impliedly* preempted, a matter discussed in some detail, *infra* at 1166–1170, the court cannot find the terms "requirement or prohibition" expressly to abolish common law remedies such as those sought by plaintiff. It is true that, as a secondary effect, tort actions may have some regulatory effect; this occurs because the primary and unquestionable effect of a finding of tort liability is to shift the "burden of losses" to "those who are in a position to either control the danger or make an equitable distribution of the losses when they do occur." *Henningsen v. Bloomfield Motors, Inc.*, 32 N.J. 358, 379, 161 A.2d 69 (1960). Indeed, compensation is the very purpose of tort liability in this state and elsewhere. *See, e.g., O'Brien v. Muskin Corp.*, 94 N.J. 169, 179, 463 A.2d 298 (1983); *Michalko v. Cooke Color & Chemical Corp.*, 91 N.J. 386, 398, 401, 451 A.2d 179 (1982); *Beshada v. Johns-Manville Product Corp.*, 90 N.J. 191, 205–06, 209, 447 A.2d 539 (1982); *Suter v. San Angelo Foundry & Machine Co.*, 81 N.J. 150, 173, 406 A.2d 140 (1979) ("Strict liability ... is but an attempt to minimize the costs of accidents and to consider who should bear those costs."); *Santor v. A & M Karagheusian, Inc.*, 44 N.J. 52, 65, 207 A.2d 305 (1965) (purpose of tort liability "is to insure that the cost of injuries or damage ... resulting from defective products ... is borne by the makers of the products who put them in the channels of trade, rather than by the injured or damaged persons who ordinarily are powerless to protect themselves.") *See also Cinnaminson Township Board of Education v. U.S. Gypsum Co.*, 552 F.Supp. 855, 857 (D.N.J. 1982), quoting *Ramirez v. Amsted Industries, Inc.*, 86 N.J. 332, 350, 431 A.2d 811 (1981) ("... this court has long recognized the significance of the social policy of risk-spreading in establishing the manufacturer's duty to the product user under the rapidly expanding principles of strict liability in tort.") *See generally Greenman v. Yuba Power Products, Inc.*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 701, 377 P.2d 897 (1962) (citing authorities); Prosser and Keeton, *The Law of Torts* § 1 at 5, § 4 at 20 (1984); Harper and James, *The Law of Torts* § 13.2 at 762–63 (1965). As defendants correctly contend, the imposition of tort liability may as a consequence, have a regulatory impact. Indeed, one purpose of products liability law is "to motivate individuals in the context of commercial enterprise to invest in safety." *Michalko, supra,* 91 N.J. at 398, 401 n. 4, 451 A.2d 179; *Beshada, supra,* 90 N.J. at 206–07, 447 A.2d 539. *See also* Prosser and Keeton, *supra,* § 4 at 25–26. Whether that regulatory impact conflicts with the purposes of the Act is a matter of implied preemption, and will be discussed later. Whether such impact comprises regulation, that is, creates a "requirement or prohibition," raises the question of express preemption.

The court finds that it does not. Regulation implies that certain behavior be absolutely required or prohibited: thus, one may not run a red light, or under the Act, fail to produce a cigarette package without the warning required by § 1333, without risking criminal liability or injunctive sanctions. Such behavior is prohibited and, in that sense, regulated. Similarly, were the

*Examiners,* 374 U.S. 424, 444, 83 S.Ct. 1759, 1770, 10 L.Ed.2d 983 (1963) (Brennan, J., concurring) (a general savings clause "does not resolve specific problems ... but its inclusion in the statute plainly is inconsistent with congressional displacement of the state statute unless a finding of that meaning is unavoidable"), *cited in Lockheed Air Terminal, Inc. v. City of Burbank,* 457 F.2d 667, 675 (9th Cir.1972) (finding of preemption "unavoidable" under Federal Avia-

tion Act), *aff'd,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973). *See generally, Note, supra,* 12 Stanf.L.Rev. at 211–15 (courts have paid "slight attention" to savings clauses); *Sands, supra,* § 47.24 at 128 (where "the policy and purpose of the statute indicate that the common law was intended to be superseded, and the wording of the statute is so complete that it reasonably appears to be exclusive" statute may preempt the common law).

New Jersey Legislature to mandate that a different warning be placed on cigarette packages, it would be imposing a requirement and, in that sense, regulating; such statute would, of course, be expressly preempted by the Act. Tort liability, however, merely "motivates" a person or business entity to act or refrain from acting by creating certain financial incentives; failing to do so, however, may or may not subject one to recurrent tort liability, and cannot subject one to an injunction or to criminal penalties in the common law context.[6] Hence, the producer of a defective produce, who has been found liable in tort is put to a choice: it may avoid the risk of future liability by remedying the defect in its product or, at the extreme, by withdrawing such product from the market, or it may confront such risk, hoping that future juries, acting in light of different sets of facts, will find for it. Which course it takes depends upon a complex combination of economics, morality and psychology. In this sense, tort liability does not regulate at all; it merely creates some probability of changing the behavior of those upon whom it imposes liability, and without dictating the form of such change. *See generally Ferebee v. Chevron Chemical Co., supra,* 636 F.2d at 1541. What that probability is, and the form such behavioral change would take, provides a starting point for an analysis of whether a conflict exists between the imposition of state tort liability and federal legislation, here, the Act. However, the differences between regulation and motivation are such as to preclude a finding of express preemption. As the one scholar who has explored this particular question has written

> Courts adjudicate prior misconduct and require payment for injury. When a court imposes liability for failure to adequately warn, no specific "statement relating to smoking and health" is being required. The practical effect of this may be that cigarette companies will choose to add an addiction warning so as to avoid future liability. A damages award, however, requires only payment—it is not an injunction requiring the defendant to incorporate into its advertising a fixed legend different from the federally required label. The labeling acts do not prohibit a manufacturer from warning of undisclosed health risks. The only prohibition is against a state agency passing a law requiring cigarette companies to use a different label.

D. Garner, *Cigarette Dependency and Civil Liability: A Modest Proposal,* 53 S.Cal. L.Rev. 1423, 1454 (1980) (footnote omitted).

The question of express preemption and the legal issues raised thereby ought not, under the principles enunciated *supra,* at 8–16, be resolved so as to displace traditional state common law remedies unless Congress' expression of its desire to do so is crystal clear. Congress' words reveal far less clarity: it did not expressly preempt the common law claims asserted here.[7]

---

**6.** The federal courts have long held that there is no federal common law of crimes, *see, e.g., United States v. Best,* 573 F.2d 1095, 1101 (9th Cir.1978), citing *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 249, 96 L.Ed. 288 (1952); *United States v. Coolidge,* 14 U.S. (1 Wheat.) 415, 4 L.Ed. 124 (1816); *United States v. Hudson,* 11 U.S. (7 Cranch) 32, 3 L.Ed. 259 (1812). *See also United States v. Berrigan,* 482 F.2d 171, 185 (3d Cir.1973); *Levy v. Parker,* 478 F.2d 772, 796 and n. 35 (3d Cir.1973), *rev'd on other grounds,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), and New Jersey agrees. N.J.S.A. 2C:1–5(a) ("Common law crimes are abolished and no conduct constitutes an offense unless the offense is defined by this code or another statute of this state.")

**7.** It should be noted that this section addresses only plaintiff's claims regarding failure to warn, Counts 3, 4 and 8, and deceptive advertising, Counts 5, 6 and 9. It does not address plaintiff's risk-utility allegation, contained in Count 2 and, to an extent, Count 7, of the complaint, because defendants do not contend that such claim is expressly preempted, but only that it is impliedly preempted as a result of conflict with the Act, Brief of Defendant Loew's Theatres, Inc. at 31–32, or because the Act has occupied the field. *Id.* at 32–33. Nor could defendants argue that this sort of claim has been expressly preempted, for language of the Act addresses only cigarette package labelling, on the one hand, 15 U.S.C. § 1334(a), and advertising or promotion, on the other. 15 U.S.C. § 1334(b).

## B. *Implied Preemption*

As discussed earlier, the fact that plaintiff's common law claims are not expressly *preempted* does not end this inquiry. Rather, such claims may be *impliedly* preempted if Congress so intended, and manifested such intent either by "occupying the field," or if plaintiff's claims implicate state law which "actually conflicts" with the Act. The question of implied preemption necessarily requires a careful examination of the legislative history of the Act.

Defendants rest their implied preemption arguments on three aspects of the legislative history of the Act. First, they state that Congress made it absolutely clear that the Act was not meant as a prohibition of cigarette manufacture, sale or use. Citing the legislative history, defendants point to congressional concern with the moral and economic effects of such a prohibition, as well as to evidence that cigarette smoking actually enhances psychological and social well-being. Second, defendants point to Congress' desire to enact a uniform national policy with respect to the relationship between smoking and health, in part in order to protect the aforestated values. And third, at oral argument, defendants contended that Congress intended that only the statement prescribed in § 1333 appear on cigarette packages; thus, they argue, no court may impose a greater duty to warn and, indeed, no cigarette company may voluntarily utilize a different warning.

Plaintiff counters that the legislative history assumes the continued existence of common law tort actions against cigarette companies, particularly in the area of products liability. Specific passages indicate debate over the effect of the warning mandated upon the defense of assumption of the risk but, plaintiff argues, thus indicate an acceptance of the existence of the common law suits in which such defense would be pled. Moreover, plaintiff contends, Congress could not have intended, and did not intend, to deprive prospective plaintiffs of the remedy at law here sought.

The parties support their contentions with persuasive statutory authority and legislative history. Hence, defendants rely upon the debate surrounding passage of the Act, noting that, despite the call-to-action that ensued upon issuance of the Surgeon General's January 11, 1964 report entitled "Smoking and Health: Report of the Advisory Committee to the Surgeon General of the Public Health Services," Congress chose a moderate course. Fearing the intrusion on "our personal rights and liberties" of a prohibition of cigarettes, *Cigarette Labeling and Advertising: Hearings on H.R. 2248, 3014, 4007, and 4249 Before the House Committee on Interstate and Foreign Commerce*, 89th Cong., 1st Sess. 225 (1965) (statement of Emerson Foote, Chairman, National Interagency Council on Smoking and Health), Congress rejected the notion of, for example, an outright ban on manufacture and sale. *See also Hearings on H.R. 2248, supra*, at 24 (statement of Congressman Morris K. Udall) ("The Constitution guarantees us all these great freedoms including the freedom to abuse our health and make fools of ourselves if we want to, and I do not intend to deprive people of these great freedoms."); *Hearings on H.R. 643, 1237, 3055, 6543 Before the House Committee on Interstate and Foreign Commerce*, 91st Cong., 1st Sess., 348 (1969) (statement of Dr. Sol R. Baker, Chairman, Committee on Tobacco and Cancer, American Cancer Society) ("... we are against prohibition. Some of us lived through one era of prohibition, and we certainly would not like to see another. We feel that it is the individual's right to smoke if he decides to ..."); H.Rep. No. 449, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.Code Cong. & Adm.News 2350, 2352 ("... the Committee believes that the individual must be safeguarded in his freedom of choice—that he has the right to choose to smoke or not to smoke ..."). Indeed, it is even true that, in opting for a response to the Surgeon General's conclusion that "Cigarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action," Congress heard testimony of the "significant beneficial effects of smoking primarily in the area of mental health."

*Hearings on H.R. 2248, supra,* at 167, (statement of Rep. Horace R. Kornegay) quoting the Surgeon General's 1964 Report at 356. *See also id.* at 438–39 (statement of Fred S. Royster, Managing Director, Bright Belt Warehouse Association) ("There seems to be no doubt but that the use of tobacco in its various forms is relaxing, is enjoyable, and is conducive of a measure of contentment .... It is possible that the relaxation and contentment and enjoyment produced by smoking has lengthened many lives."); *Hearings on H.R. 643, supra,* at 551 (statement of Joseph F. Cullman, III, Chairman of the Executive Committee, The Tobacco Institute); *id.* at 1008–09 (statement of Dr. Charles Hine, Clinical Professor of Pharmacology and Preventive Medicine, Univ. of California).[8] Most importantly, perhaps, Congress' choice of labeling as the appropriate response to the Surgeon General's conclusion that '[c]igarette smoking is associated with a 70-percent increase in the age-specific death rates of males" due to lung cancer, chronic bronchitis and emphysema, and cardiovascular diseases, *see* S.Rep. No. 195, 89th Cong., 1st Sess. 2–3 (1965), quoting the Surgeon General's 1964 Report, was the result of economic considerations. Indeed, the Act, in its preamble, seeks explicitly to protect "commerce and the national economy ... to the maximum extent consistent with this declared policy ...." 15 U.S.C. § 1331(2)(A). Thus, in 1965, Congress heard repeatedly of the economic ramifications of its proposed actions on the tobacco industry, "clearly a vital sector in this country's economy." *Hearings on S. 559 and S. 547 Before the Senate Committee on Commerce,* 89th Cong., 1st Sess. 246 (1965) (statement of Bowman Gray, Chairman of the Board, R.J. Reynolds Tobacco Co.). *See also id.* at 396–97 (statement of Sen. Sam J. Ervin, Jr.); *id.* at 543–45 (statement of Fred S. Royster, Managing Director, Bright Belt Warehouse Association); *id.* at 638–39 (statement of Ziggy Lane, Field Coordinator, National Association of Tobacco Distributors); 111 Cong. Rec. 13897–98 (June 16, 1965) (statement of Sen. Bass); 111 Cong.Rec. 13914–15 (June 16, 1965) (statement of Sen. Ervin). For example, Congress heard that, at that time, cigarettes were smoked by over 70 million people, spending over $8 billion, of which $3.3 billion went to excise taxes, supporting 750,000 farm families, as well as 96,000 persons in manufacturing. In all, tobacco was American's fifth largest cash crop, and accounted for $405 million in exports. These statistics had become more impressive by 1969, when Congress again took up the issue, ultimately resolving to strengthen the Surgeon General's warning. *Hearings on H.R. 643, supra,* at 25–26 (statement of Rep. John L. McMillan), 42–43 (statement of Reps. Richardson Preyer and Wilmer D. Mizell), 61–63 (statement of Rep. W.M. Abbitt), 64 (statement of Rep. William H. Natcher), 604–05 (statement of Robert W. Scott, Governor of North Carolina); 115 Cong.Rec. 16189–91 (June 17, 1969) (statement of Rep. Edwards), 115 Cong.Rec. 16193–94 (June 17, 1969) (statement of Rep. Fountain); 115 Cong.Rec. 16294 (June 17, 1969) (statement of Rep. Abbitt). In light of these facts, Congress chose to attack the health problems associated with cigarette smoking not by virtue of a tobacco prohibition, but through a labeling requirement, made stronger in 1969 so as to be more effective. *See* S.Rep. No. 91–566, *supra,* at 2664; H.Rep. No. 91–289, *supra,* at 5.

---

**8.** These considerations did not, however, appear in the Senate or House reports, or the Conference report in either 1965 or 1969. *See* S.Rep. No. 195, 89th Cong., 1st Sess. (1965); H.Rep. No. 449, 89th Cong., 1st Sess. (1965); H.Rep. No. 586, 89th Cong., 1st Sess. (1965) (Conference Report), U.S.Code Cong. & Admin.News 1965, p. 2350; S.Rep. No. 91–566, 91st Cong., 1st Sess. (1969); H.Rep. No. 91–289 91st Cong., 1st Sess. (1969); H.Rep. No. 91–897 91st Cong., 2nd Sess. (1970) (Conference Report), U.S.Code Cong. & Admin.News 1970, p. 2652. It is therefore not clear that these "beneficial effects" were actually considered by Congress. *See generally* Sands, *supra,* § 48.10 at 209 ("Although statements in the committee report as to the reason for or the nature and effect of the proposed law are freely used by the courts to determine the intent of the legislature, they have been more hesitant in resorting to similar statements made by committee members or other persons at the committee's hearings.")

Defendants are thus correct that Congress did not intend, by passing the Act, to eradicate the tobacco industry and did not expect to abolish cigarette smoking. They are also correct that Congress viewed this goal as being furthered by the preemption provision of the statute, which would serve to eliminate "diverse, non-uniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health," 15 U.S.C. § 1331(2)(B), and to establish "a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health." 15 U.S.C. § 1331. (Congressional declaration of policy and purpose). Indeed, the preemption provision of the Act, and the policy which underlies it, grew out of a concern that various states and localities would enact conflicting laws and ordinances.

> Some of the bills now pending before State legislatures would require a warning notice in cigarette advertisements appearing in periodicals published within the State. Others would require a health warning in cigarette commercials broadcast on a TV or radio station located within the State. The proposed form of the required caution notice varies from State to State.

> As a practical business matter, it would be almost impossible for any manufacturer to comply with all of these differing and conflicting State and local laws . . .

> If Congress does not extend [§ 1334], there will be piecemeal and conflicting Federal and State regulations in this field. There will be litigation. And there will be enormous confusion and uncertainty. These are precisely the considerations which prompted Congress in 1965 to preempt this matter.

*Hearings on H.R. 643, supra,* at 554 (statement of Joseph F. Cullman, III). Indeed, congressional action in 1965 was directed at avoiding the "maze of conflicting regula-

tions" which would have resulted had Congress not acted in this area. 111 Cong.Rec. 13901 (June 16, 1965) (statement of Sen. Moss). *See* S.Rep. No. 195, *supra,* at 4; H.Rep. No. 449, *supra,* at 2352. And, in 1969, Congress looked back at what it had done and, apparently saw itself as having "fended off efforts by regulatory agencies, individual state governments, and local governments in some cases to invade its jurisdiction." *Hearings on H.R. 643, supra,* at 16 (statement of Rep. Carl D. Perkins). *See also* 115 Cong.Rec. 16299 (June 18, 1969) (statement of Rep. Preyer). Rejecting the argument that states, or their subdivisions, ought to be able to "alert their own citizens to the dangers of smoking," *Hearings on H.R. 643, supra,* at 288 (statement of John F. Banzhaf, III, Executive Trustee, Legislative Action on Smoking and Health), *see also* H.Rep. No. 91–289, *supra,* at 33 (minority views of Reps. Jarman, Dingell and Adams), Congress clarified and continued the preemption provisions then in effect. *See* S.Rep. No. 91–556, *supra,* reported in 1969 U.S.Code Cong. & Adm.News 2652, 2663; H.Rep. No. 91–289, *supra,* at 4, 7, 9. Both in 1965, and again in 1969, Congress spoke of its actions in the language of preemption. Thus, for example, Senator Morton stated that "[t]he problem of smoking and health is national in scope. It is clearly one in which Congress should occupy the field." 111 Cong.Rec. 13930 (June 16, 1965). Senator Magnuson, Chairman of the Senate Commerce Committee, apparently agreed

> I think that all of us, or at least speaking for myself, are in general agreement . . . that if this matter is to be attended to, that it should be on a Federal level rather than a local or State level.

> This is for very practical reasons, along with other reasons. If there is one product that is completely in interstate commerce it is tobacco.

> It is grown in very few states and shipped all over to every state in the Union, every country in the world and, therefore, it would make it highly impractical and I think a burden on interstate commerce in this field should you

have all kinds of regulations in various states.

*Hearings on S. 559, supra,* at 254. *See also id.* at 548. And, in 1969, Congressman Fountain argued:

... all of us are mindful of the fact that there are certain areas in which the national interest is so paramount—where individual state laws might so jeopardize the national interest—that preemption is necessary; and in my opinion the problem here and the facts are so obvious— with every state and probably many municipalities passing different regulations requiring the manufacturers of cigarettes to have different labels on packages going into different states and areas—that the situation would become intolerable and so confusing and so frustrating to all concerned that the entire tobacco industry might be destroyed. For these reasons I believe in the doctrine of preemption in this case.

*Hearings on H.R. 643, supra,* at 30.

From these, and other, statements, defendants glean a congressional intent to preempt a field which includes the common law claims here asserted. They bolstered this assertion at oral argument by asserting that Congress intended that only the warning set forth in § 1333 be permitted to appear on cigarette packages; hence, a cigarette manufacturer found liable would not be permitted to escape such liability by altering its behavior, a result which, they claim, could not have been intended by Congress. In support of this position, defendants cite to congressional concern that the labeling requirement include a concise statement:

Such cautionary statement should be short and direct, and should not be weakened in its impact by any qualifying adjectives such as "excessive," "continual," or "habitual." To this end, the committee had concluded that the following factual and succinct statement should now be prescribed: "Caution: Cigarette smoking may be hazardous to your health."

S.Rep. No. 195, *supra,* at 4. Consistent with such concern, the 1969 amendments to the Act changed the warning to: "Caution: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health." 15 U.S.C. § 1333. In so doing, and thereby lengthening the warning, Congress opted for a shorter warning than that proposed by the House, which had required a label stating "Warning: The Surgeon General Has Determined That Cigarette Smoking Is Dangerous to Your Health and May Cause Lung Cancer or Other Diseases," but longer and more equivocal than that proposed by the Senate, *i.e.,* "Warning: Cigarette Smoking Is Dangerous to Your Health." *See* H.Rep. No. 91–897, *supra,* at 5 (Conference Report). Defendants do not, however, point to any passages stating explicitly that cigarette manufacturers would violate the Act by including a statement in addition to that prescribed in § 1333. Nor is the language of the Act to that effect.

Plaintiff recognizes the arguments proffered by defendant, responding simply, that Congress not only did not explicitly preempt state common law claims, but assumed their continued existence. In support of this argument, plaintiff also quotes extensively from the legislative history. It is true, as plaintiff argues, that discussions of preemption are silent as to the common law; it is also true that they focus upon executive or legislative regulation. First, congressional concern regarding preemption have, as plaintiff indicates, consistently been voiced without mention of the common law, and not even in terms of regulation in general, but of "laws" or "regulations" implying particular executive or legislative enactments. *See, e.g., Hearings on S. 559, supra,* at 246, 548 (statement of Bowman Gray, Chairman of the Board of R.J. Reynolds Tobacco Co.) ("It would be intolerable if the states ... were to remain free to pass conflicting laws or to impose conflicting regulations on this subject."); *Hearings on H.R. 643, supra,* at 30 (discussing "laws" and "regulations"); *id.* at 554 (same, discussing "bills pending before State legislatures"); S.Rep. No. 195, *su-*

*pra,* at 4 (discussion "a multiplicity of State and local regulations"); H.R.Rep. No. 449, *supra, cited in* 1965 U.S.Code Cong. & Adm.News, *supra,* at 2352 (same). Moreover, in arguing for the extension of the preemption provision in 1969, Representative Preyer of North Carolina addressed the amendment which that year altered such provision so that it no longer applied as previously to federal agencies. *See* 15 U.S.C. §§ 1335–36.

> ... that amendment speaks only to a ban on cigarette advertising by the FCC. It does not cover any other Federal agency and, more importantly, it does not cover such a ban if adopted *by each State legislature or local governing body.*

115 Cong.Rec. 16299 (June 18, 1969) (emphasis added). *See also Hearings on H.R. 643, supra,* at 610 (statement of Rep. Satterfield) (discussing federal, state and local "administrative and executive agencies"). And, perhaps most significantly, Representative Udall, in criticizing the bill ultimately passed in 1965 as one that "should be entitled, 'A bill for the relief and protection of the tobacco industry,'" listed as separate problems with the bill—which he labeled Hookers No. 1 and No. 2—its preemptive effect on "state and local government," and the extent to which it "protects [the cigarette manufacturers] against lawsuits by cigarette users," by undermining the assumption of the risk defense. 111 Cong.Rec. 16546 (July 13, 1965). Were

these problems linked, he would certainly have discussed them together; that he did not demonstrates the inapplicability of the preemption clause to common law actions. It thus appears that Congress, initially acting in fear of certain state legislative action, *see supra,* at 30, continued to contemplate regulation by legislative or administrative processes as the subject of the preemption provisions of § 1334. *See generally* Garner, *supra,* 53 S.Cal.L.Rev. at 1453–54.[9]

That common law claims were not intended for preemption is still clearer when viewed in terms of certain specifics of the congressional debate and, as defendants urge, within the historical context of that debate. *See* Brief of Defendant Loew's Theatres, Inc. at 12 (citing cases). Prior to passage and then amendment of the Act, products liability cases based upon state common law had, in fact, been brought against cigarette companies. *See, e.g., Green v. American Tobacco Co.,* 304 F.2d 70 (5th Cir.1962), *question certified on rehearing,* 154 So.2d 169 (Fla.), *rev'd and remanded,* 325 F.2d 673 (5th Cir.1963), *rev'd and remanded on rehearing,* 391 F.2d 97 (5th Cir.1968), *rev'd per curiam,* 409 F.2d 1166 (5th Cir.1969) (*en banc*), *cert. denied,* 397 U.S. 911, 90 S.Ct. 912, 25 L.Ed.2d 93 (1970) (implied warranty of fitness for use under Florida law); *Ross v. Philip Morris & Co.,* 328 F.2d 3 (8th Cir.

---

**9.** Defendants' arguments to the contrary are sparse. Defendant Liggett Group quotes Senate Report No. 91–566 as stating that the Act "prohibits health-related regulation or prohibition of cigarette advertising by any State or local authority." In reality, the 1969 Act clarified the previous preemption provision by making "it clear that the term 'State' includes any political division of any State." *Id.,* cited in 1970 U.S. Code Cong. & Adm.News 2652, 2663. And rather than stating the proposition cited in Liggett's brief, that Report actually states: "This preemption is intended to include not only action by State statute but by all other administrative actions or local ordinances or regulations by any political subdivision of the State." *Ibid.* Thus limited to legislative and executive action, this statement provides potent support for plaintiff's position.

Defendants are thus left to rely upon the singular statement of Rep. Bolling: "This preempts

the right of any entity, of any government, to decide for itself ...." 111 Cong.Rec. 16545 (July 13, 1965). In addition to the fact that this statement was immediately followed by remarks of Rep. Springer indicating the continued existence of common law suits, *see infra* at 38, remarks for which Rep. Bolling thanked Rep. Springer, the court notes that defendants should heed their own admonition: the remarks of a single legislator should "rarely ... be taken as final." Brief of Defendant Loew's Theatres, Inc. at 21 n. 12, citing *Schiaffo v. Helstoski,* 492 F.2d 413, 428 (3d Cir.1974). This is especially so where these remarks are uncharacteristic of congressional debate in general. *Ibid.* Here, Rep. Bolling may well have been making clear that which was clarified in 1969—that the preemption provision applied to "any government," including that of a locality.

1964) (implied warranty of fitness for use under Missouri law); *Lartigue v. R.J. Reynolds Tobacco Co.*, 317 F.2d 19 (5th Cir.), *cert. denied,* 375 U.S. 865, 84 S.Ct. 137, 11 L.Ed.2d 92 (1963) (implied warranty of fitness under Louisiana law), *cited in Hudson v. R.J. Reynolds Tobacco Co.*, 427 F.2d 541 (5th Cir.1970); *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292 (3d Cir.1961), *aff'd on rehearing,* 350 F.2d 479 (3d Cir.1965), *cert. denied,* 382 U.S. 987, 86 S.Ct. 549, 15 L.Ed.2d 475 (1966), *modified,* 370 F.2d 95 (3d Cir.1966), *cert. denied,* 386 U.S. 1009, 87 S.Ct. 1350, 18 L.Ed.2d 436 (1967) (warranty of fitness for use and negligent failure to warn, under Pennsylvania law); *Cooper v. R.J. Reynolds Tobacco Co.*, 234 F.2d 170 (1st Cir.1956) *on remand,* 158 F.Supp. 22 (D.Mass.1957), *aff'd,* 256 F.2d 464 (1st Cir.1958) (fraud under Massachusetts law); *Albright v. R.J. Reynolds Tobacco Co.*, 350 F.Supp. 341 (W.D.Pa. 1972), *aff'd mem.,* 485 F.2d 678 (3d Cir. 1973) *cert. denied,* 416 U.S. 951, 94 S.Ct. 1961, 40 L.Ed.2d 301 (1974) (products liability action under Pennsylvania law).[10] And, although neither the statute itself nor the final committee reports explicitly address the status of these cases after passage of the Act, congressional debate recognized their continued existence. Often, such recognition took the form of discussion as to the effect of the required warning on the defense of assumption of the risk. Thus, in 1965, Congressman Fascell of Florida expressed his view that

The legislative record makes it clear tht passage of this law and compliance by the manufacturer in no way affects the right to raise the defense of "assumption or [sic] risk" and the legal requirement for such a defense to prevail; nor does it shift the burden of proof, nor could it be considered a legal or factual bar to the plaintiff user.

111 Cong.Rec. 16543–16544 (July 13, 1965). Later, Congressman Fascell clarified his position. In response to Congressman Bolling's opposition to the preemption provisions of the Act, Mr. Fascell stated:

There might be one consoling factor in the adoption of the conference report. By virtue of the language being required as a result of the law, it would raise the presumption that every company that makes and distributes this process does so with knowledge. If that is true, it would redound to the benefit of a plaintiff bringing an injury suit.

111 Cong.Rec. 16545 (July 13, 1965). Congressman Fascell thus believed that the warning would ultimately help plaintiffs in cases such as these. *See also* 111 Cong. Rec. 16546 (July 13, 1965) (statement of Rep. Udall). Theodore Ellenbogen, Acting Assistant General Counsel of the Department of Health, Education, and Welfare, testifying before the House Committee on Interstate and Foreign Commerce, disagreed.

MR. MACKAY: I would like to ask you this as a lawyer. Would not the presence of the type of warning suggested in these bills greatly strengthen the hand of a defendant in a tort case?

MR. ELLENBOGEN: In the long run it might do so, because those cases that I have read—and I have not made a real study of this particular thing—but the *Green* case, for example, is based, I believe, on the implied warranty of fitness, and there being no notice of the health hazard to the consumer.

*Hearings on H.R. 2248, supra,* at 176. In response to Representative Mackay's further inquiries on this topic, a memorandum

---

**10.** *Albright* was filed on July 5, 1962. *See* Garner, *supra,* 53 S.Cal.L.Rev. at 1423 n. 3.

It should be noted that these cases address the problems of labeling and advertising under the aegis of breach of warranty, negligence or fraud causes of action. *See, e.g., Pritchard v. Liggett & Myers, supra,* 295 F.2d at 299–300. Indeed so intertwined is labeling or advertising with any tort causes of action based upon design defects, that the position of defendants Philip Morris and Liggett Group, that the Act permitted all tort actions except those based upon labeling and advertising is absurd. *See* Brief of Defendant Philip Morris at 27–28; Brief of defendant Liggett Group at 31–32. Labels and advertisements constitute a manufacturer's public statements about its product; they are a necessary component of any common law tort analysis.

was supplied to the Committee, reviewing the caselaw, and concluding, as follows:

> Assuming a clear statement, suits based on negligence probably would be barred on three grounds. Having warned the buyer, the manufacturer could not be said to be negligent; the buyer is contributorily negligent in using a product he knows might harm him; and having been warned the buyer assumes the risk attendant to the use of the cigarettes.
>
> ... actions based on breach of warranty would probably be unsuccessful. When a seller warns a buyer of the possibility of a certain form of injury, it cannot be said that he is warranting that the injury will not occur.

*Id.* at 178.

Again in 1969, the House Committee on Interstate and Foreign Commerce considered this point at great length. Committee members attempted to show that the tobacco industry's support of the warning then in effect was as a result of the benefits it gained from the undermining of the assumption of the risk defense. *Hearings on H.R. 643, supra,* at 577–78 (colloquy between Rep. Moss and Joseph F. Cullman, III), 579–81 (colloquy between Rep. Dingell and Mr. Cullman), 589 (colloquy between Rep. Thompson and Mr. Cullman), 589 (colloquy between Rep. Satterfield and Mr. Cullman). Representative Watson disagreed. *Id.* at 579, 582. However, both in 1969, and previously, in 1965, all parties assumed the existence of lawsuits such as the instant one. Indeed, the congressional debate as to the validity of certain defenses presupposes such suits. Thus, Congressman Watson was correct when he stated that "nowhere in the Act of 1965 does it preclude an individual or prevent an individual from pursuing a common-law liabili-

ty, as far as I know ...." *Id.* at 579. In fact, in 1965, the Department of Health, Education, and Welfare considered such suits to be "a private matter ... not regulated by this bill ...." *Hearings on H.R. 2248, supra,* at 176 (statement of Theodore Ellenbogen).

The legislative history thus supports plaintiff's position in these respects.[11] Such position is further strengthened by the structure of the statute ultimately passed: although injunctive relief is available if sought by the government, 15 U.S.C. § 1339, and minimal criminal sanctions applicable to violations of the Act, 15 U.S.C. § 1338, the statute is silent as to damage claims. Absent the existence of common law claims such as those asserted by plaintiff, victims of cigarette smoking would thus be left with no remedy at all, a result which is "inconceivable," *Silkwood v. Kerr-McGee Corp., supra,* 104 S.Ct. at 629 (Blackmun, J., dissenting), especially in light of the existence of such claims prior to passage of the Act. Nonetheless, such claims might be preempted notwithstanding this legislative history if it were found either that Congress "occupied the field" or that the existence of such claims creates an actual conflict with the Act. It is these concerns that the court next addresses.

### 1. *Did Congress preempt state common law claims by occupying the field?*

■ As the court has noted earlier, preemption implied from legislative intent may be inferred where Congress "occupied the field" in a given area. Whether Congress did so may, in turn, be inferred in any of three ways: first, if there is a pervasive scheme of federal regulation in such area; second, if the federal interest in such area is dominant; and third, if the objective of

---

**11.** It also supports plaintiff's position with respect to the "addiction theory" of Count 9 and the advertising claims of Counts 4 and 5 of plaintiff's complaint. It is true that Congress chose not to address the addiction problem, despite the presentation of "a great deal of scientific testimony" regarding the issue. *See* Brief of Defendant Loew's Theatres, Inc. at 27, citing legislative history. Nor, however, did it distinguish claims based upon addiction from

the others which it chose not to preempt. *See* Garner, *supra,* 53 S.Cal.L.Rev. at 1453–54. Similarly, congressional inaction regarding the recognized dangers associated with cigarette advertising and promotion, *see id.* at 29, citing legislative history, ought not be construed as forbidding damage claims for injuries caused by such advertising and promotion, if such causation can be proved.

federal law in such area and the obligations imposed by it reveal the same purpose. *See supra* at 1150. Defendants argue that Congress explicitly intended to preempt the field and that, in debate and elsewhere, it demonstrated such intent explicitly and by creating a pervasive scheme of federal regulation to deal with a problem uniquely federal in scope. The court disagrees.

■ It is true that at least one Senator stated that "[t]he problem of smoking and health is national in scope. It is clearly one in which Congress should occupy the field." 111 Cong.Rec. 13930 (June 16, 1965) (statement of Sen. Morton). Other Senators, Representatives and delegates from the tobacco industry, the executive branch, and public interest groups agreed that federal regulation was necessary, in order to avoid a "maze of conflicting regulations" and deal with "a product that is completely in interstate commerce." *See supra* at 1159. Hence, Congress passed a bill purporting "to establish a comprehensive federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health." 15 U.S.C. § 1331.

The court agrees that Congress thus intended to occupy *a* field and that it indicated this intent as clearly as it knew how. It utilized the language of preemption; it stated that it was establishing a pervasive scheme of regulation; and it discussed the dominant federal interest in the fields affected by its intended regulation. *See, e.g.,* H.Rep. No. 449, *supra,* at 2351–52 ("The problem has broad implications in the field of public health and health research, and involves potentially far-reaching consequences for a number of sectors of our economy. The entire tobacco raising and manufacturing industry, and the numerous businesses which market tobacco products, are involved. Some proposals have been made in this area which might lead to severe curtailing or the possible elimination of cigarette advertising. This could have a serious economic impact on the television, radio, and publishing industries in the United States."); 111 Cong.Rec. 14,423 (June 22, 1965) (statement of Rep. Harris) (". . . this is an interstate problem.") However, the legislative history of the Act, as well as its language, persuades the court that the field it occupied does not encompass the common law products liability claims here asserted. That field was expressly limited to "cigarette labeling and advertising with respect to any relationship between smoking and health," 15 U.S.C. § 1331; the preemption provision of the Act proscribes state or local action that would *require* a particular statement on cigarette packages, 15 U.S.C. § 1334(a), or impose any "requirement or prohibition" with respect to cigarette advertising. 15 U.S.C. § 1334(b). Congress addressed itself to a problem national in scope, and in 1965, and again in 1969, chose to remedy that problem by requiring certain labeling, and regulating advertising, and finally making it "unlawful . . . on any medium of electronic communications subject to the jurisdiction of the Federal Communications Commission." 15 U.S.C. § 1335. It did not, however, address itself to the problem of compensating the victims of cigarette smoking, and/or imposing civil liability on cigarette companies. Indeed, the issues are within a different field, that of products liability, the continued existence of which was assumed by Congress, and left for the states. Especially because "federal occupation of a field will not be lightly inferred," Tribe, *supra,* § 6–25, at 384 (citing cases), the fact that two different areas are thus implicated renders preemption improper. *See, e.g., Silkwood v. Kerr-McGee Corp., supra,* 104 S.Ct. at 622–26 (Price-Anderson Act does not preempt state tort law remedies); *Pacific Gas and Electric, supra,* 103 S.Ct. at 1726 (Atomic Energy Act leaves to the states traditional powers to regulate utilities); *Sears-Roebuck & Co. v. San Diego County District Council of Carpenters, supra,* 436 U.S. at 194–97, 98 S.Ct. at 1756–57 (cases relating to labor relations are not preempted if "different from" those presented to the National Labor Relations Board); *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 336, 93 S.Ct. 1590, 1597, 36 L.Ed.2d 280 (1973)

(Water Quality Improvement Act does not preempt state common law claims for damages for oil spillage); *Huron Cement Co. v. City of Detroit*, 362 U.S. 440, 445, 80 S.Ct. 813, 817, 4 L.Ed.2d 852 (1960) (Detroit ordinance had different purposes from, and therefore is in a different field than congressional enactments concerning shipping). That the areas are similar begins rather than ends the inquiry; where Congress limits the scope of its enactment and manifests its intent not to interfere with areas beyond that scope, the preemptive effect of such enactment must be similarly proscribed. *See generally Pacific Gas & Electric, supra*, 103 S.Ct. at 1726 ("When the federal government completely occupies a given field or an identifiable portion of it ... the test of preemption is whether 'the matter on which the state asserts the right to act is in any way regulated by the federal government.' "), quoting *Rice v. Santa Fe Elevator Corp., supra*, 331 U.S. at 236, 67 S.Ct. at 1155. Admittedly, the areas addressed by plaintiff's complaint, and those within the scope of the Act are related. Cigarette labeling and advertising are at issue in plaintiff's complaint, and the form they take may be affected by this lawsuit, if successful. However, as it did with respect to the Price-Anderson Act and, more explicitly, the Water Quality Improvement Act, Congress, in enacting the Federal Cigarette Labeling Act, intended only that states be precluded from regulating cigarette labeling and advertising. Com-

pensation is, as the court has noted elsewhere, an entirely different matter. *See supra* at 1155–1156. The legislative history demonstates that Congress assumed that, in appropriate cases and where liability could be proven, such compensation would be paid, though such cases had failed in the past. It limited the scope of the Act, and especially of the preemption provision to that which it feared would interfere with the operation of the Act, and the health of the tobacco industry—state or local regulation, by statute, ordinance or other official legislative or executive enactment. It correspondingly limited the obligations imposed and the remedies available under the Act to those consonant with this purpose: a particular label was required, 15 U.S.C. § 1333, advertising was regulated, 15 U.S.C. § 1334–35, and reports were called for. 15 U.S.C. § 1337. Only the government can enforce the statute, by criminal prosecution or injunction. 15 U.S.C. § 1338–39.[12] Products liability standards are thus left to the states, and mention of the corresponding private rights of action and damage remedies available to individuals is omitted from the Act. *See generally Rice v. Santa Fe Elevator Corp., supra*, 331 U.S. at 230, 67 S.Ct. at 1152 (field preempted by federal statute determined, in part, by objective thereof) (citing cases); *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin, supra*, 418 U.S. at 271, 94 S.Ct. at 2774 (field preempted by federal

---

**12.** However, Congress did not create a particularly pervasive or comprehensive regulatory system when enacting the Cigarette Labeling Act. *See* Tribe, *supra*, § 6–25 at 385 (where a multiplicity of federal regulations govern a given field, the pervasiveness of the regulations will help to sustain a conclusion that Congress intend to exercise exclusive control over the subject matter ), citing *Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America v. Lockridge*, 403 U.S. 274, 296, 91 S.Ct. 1909, 1922, 29 L.Ed.2d 473 (1971); *Castle v. Hayes Freight Lines, Inc.*, 348 U.S. 61, 75 S.Ct. 191, 99 L.Ed. 68 (1954). *See also Fidelity Federal Savings & Loan Association, supra*, 458 U.S. at 153, 102 S.Ct. at 3022. *But see New York Department of Social Services v. Dublino*, 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688 (1973) (rejecting the contention that "pre-

emption is to be inferred merely from the comprehensive character" of the provisions at issue), *cited in Motor and Equipment Manufacturers Association, Inc. v. E.P.A.*, 627 F.2d 1095, 1107–08 and n. 20 (D.C.Cir.1979), *cert. denied*, 446 U.S. 952, 100 S.Ct. 2917, 64 L.Ed.2d 808 (1980). Here, while defendants are correct that Congress has evinced continuing interest in the area of cigarette smoking, *see* Brief of Defendant Loew's Theatres, Inc. at 33–34, regulation of the area has been considerably less pervasive than in such areas as labor law, interstate trucking and banking, in which preemption was found to exist, or in welfare, the environment, or even nuclear power, in which such preemptive effect has been limited or denied. *See supra* (cases cited in this note); *Silkwood, supra; Pacific Gas & Electric, supra*.

statute determined, in part, by remedies available thereunder). These private rights of action and private remedies, traditionally governed by state law, ought not, therefore, be assumed to be eradicated by the Act. *See Rice, supra,* 331 U.S. at 230, 67 S.Ct. at 1152. Congress did not intend that they be, and this court will not render them so.

### 2. *Does state tort law conflict with the Act?*

As in *Silkwood,* the question of preemption here turns ultimately "on whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law." 104 S.Ct. at 626. *See also Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co., supra,* 450 U.S. at 317–18, 101 S.Ct. at 1130. As noted above, a conflict occurs either where compliance with state and federal law is a "physical impossibility" or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *See supra* at 1151. However, in general, conflicts ought not lightly be inferred. As the Supreme Court has recently stated, in a different context:

> The existence of a hypothetical or potential conflict is insufficient to warrant the preemption of the state statute. A state regulatory scheme is not preempted by the federal antitrust laws simply because in a hypothetical situation a private party's compliance with the statute might

cause him to violate the antitrust laws. A state statute is not preempted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect.

*Rice v. Norman Williams Co.,* 458 U.S. 654, 659, 102 S.Ct. 3294, 3299, 73 L.Ed.2d 1042 (1982) (citing cases). Implicitly utilizing this standard, the one federal court that has construed the preemption provision of the Act refused to find a conflict between the goal of uniformity, as embodied therein, and FCC regulation of television broadcasts regarding cigarettes. *Banzhaf v. F.C.C.,* 405 F.2d 1082, 1090–91 (D.C.Cir.1968), *cert. denied,* 396 U.S. 842, 90 S.Ct. 51, 24 L.Ed.2d 93 (1969) (Bazelon, C.J.).[13] Nonetheless, the question of whether or not New Jersey common law of products liability conflicts with the Act is one of first impression.[14]

This question requires that the court first examine the purposes of the Act. As we have seen, as they relate to its preemption provision, those purposes are essentially two: first, Congress intended to ensure the continued vitality of the tobacco industry, for economic reasons and to preserve freedom of choice for the individual; second, Congress sought to implement this and other goals by making uniform the labeling and advertising requirements imposed upon cigarette manufacturers. Defendants also point to the obvious remedial purposes of the Act, which sought to address the health concerns raised by the Surgeon General's Report, and argue that these purposes are best furthered by a concise and unambiguous warning. It is claimed that all of these purposes will be

---

**13.** The one scholar that has examined this provision has concluded that "[t]he labeling acts manifest neither a congressional intention to preempt courts from granting money judgments nor a conflict between such judicially imposed liability and federal law." Garner, *supra,* 53 S.Cal.L.Rev. at 1454.

**14.** Defendants are correct that, in addressing this question, the court focuses not upon the purposes of state law, be they regulatory or merely compensatory, but upon the effect of such law. *See, e.g., Perez v. Campbell,* 402 U.S. 637, 650–652, 91 S.Ct. 1704, 1711–12, 29 L.Ed.2d

233 (1971). Thus, the court here examines "first the purposes of the federal law and second the *effect* of the operation of the state law on these purposes." *Finberg v. Sullivan,* 634 F.2d 50, 63 (3d Cir.1980) (emphasis supplied), citing *Perez, supra.* In this sense, the analysis here undertaken differs from· that regarding express preemption, *supra,* at 1153–1156. There, the question was one of whether the New Jersey common law of products liability constituted regulation; the New Jersey courts' characterization of such law is much more relevant to that inquiry.

undermined by the simultaneous existence of state common law claims such as those asserted by plaintiff.

The court first notes that in no event is compliance with both the Act and state law a "physical impossibility." At most, state law imposes liability in the form of damages upon defendants. Payment of such damages, as well as fulfillment of the labeling requirements of the Act, are clearly possible. Indeed, the imposition of criminal liability under the Act, as well as the payment of damages, are both possible. *See Silkwood, supra,* 104 S.Ct. at 626. Defendants, however, argue that state common law may impose, for example, labeling requirements inconsistent with the Act, rendering compliance with both impossible. This argument is without merit. First, as observed earlier, common law liability does not impose requirements upon any party; rather, it allows parties to choose between risking further liability by not changing their behavior, or attempting to negate such risk by, for example, adding a more stringent label to a cigarette package. Which course of action one takes is a matter of choice; one cannot be enjoined or held criminally liable for the course taken. Hence, no requirement is imposed. As the Court of Appeals for the District of Columbia has recently stated, in holding that a label found adequate by the Environmental Protection Agency for purposes of the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 *et seq.*, ("FIFRA") could nonetheless provide the basis for liability under Maryland common law, notwithstanding a preemption clause prohibiting states from imposing different labeling requirements:

> ... Maryland can be conceived of as having decided that, if it must abide by EPA's determination that a label is adequate, Maryland will nonetheless require manufacturers to bear the risk of any injuries that could have been prevented had Maryland been allowed to require a more detailed label or had Chevron persuaded EPA that a more comprehensive label was needed. The verdict [against Chevron] does not command Chevron to alter its label—the verdict merely tells Chevron that if it chooses to continue selling paraquat in Maryland, it may have to compensate for some of the resulting injuries. That may in some sense impose a burden on the sale of paraquat in Maryland, but it is not equivalent to a direct regulatory command that Chevron change its label. Chevron can comply with both federal and state law by continuing to use the EPA-approved label and by simultaneously paying damages to successful tort plaintiffs such as Mr. Ferebee.

*Ferebee v. Chevron Chemical Co., supra,* 736 F.2d at 1541.[15] Moreover, even if a verdict against cigarette manufacturers were viewed as imposing a requirement upon them, and the manufacturers thus chose to place an additional warning on, or in their packages, such action would not be incompatible with the Act. Section 1333 makes it unlawful not to place the prescribed warning on cigarette packages; it is silent as to additional information or warnings that might also be included.[16] Hence, it is not "physically impossible" for

---

**15.** Defendant Loew's Theatres, Inc. has attempted to distinguish *Ferebee* from the instant matter, based primarily upon the regulatory scheme created by FIFRA. It is true that FIFRA, unlike the Federal Cigarette Labeling Act, delegates great responsibility to the states. From this fact, defendant gleans a legislative intent not to preempt state common law claims. While the existence of a state role may be evidence of an intent not to preempt, it is neither the only such evidence, nor necessary to a holding that preemption has not occurred. Just as the court did in *Ferebee,* and in *Silkwood,* this court has examined the legislative history of the Act at issue

in great detail. Its conclusion—that preemption is not warranted—is based, as it should be, on that particular history. *See Note, supra,* 12 Stanf.L.Rev. at 208–210. Other cases, such as *Ferebee* and *Silkwood,* state general principles applicable here, but the court recognizes that the results reached in each of those cases are instructive only by analogy.

**16.** Because the Act carries criminal penalties, it should be strictly construed. *See, e.g., United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971).

a cigarette manufacturer to choose to alter its behavior in response to an adverse jury verdict.

Nor does the existence of state common law claims stand as an obstacle to the execution of Congress' intent in passing, and then amending, the Act. Primarily, this is because, as in *Silkwood*, Congress intended that state common law claims survive, and thus, that whatever tension exists between federal regulation of cigarette labeling and advertising and state common law claims be tolerated. 104 S.Ct. at 625. That congressional intent is, as has been shown, clear: state common law claims existed prior to passage of the Act, were assumed to have a continued existence during the legislative process, and were not eliminated by the passage of the Act. Though it is true that, as defendants argue, even state regulation supplementary to a federal enactment—a characterization not inapposite here—may be preempted by such federal enactment, *see, e.g., Campbell v. Hussey*, 368 U.S. 297, 302, 82 S.Ct. 327, 329, 7 L.Ed.2d 299 (1961); *Cosmetic, Toiletry & Fragrance Association, Inc. v. State of Minnesota*, 440 F.Supp. 1216, 1224 (D.Minn.1977), *aff'd*, 575 F.2d 1256 (8th Cir. 1978), that is only the case where there is an actual conflict between the two, and the federal enactment is "significantly impeded

by the state law." Tribe, *supra*, § 6–24 at 379 and n. 12. No such conflict exists here.

First, Congress' intention that the cigarette industry be allowed to survive, and that the consumer remain free to choose or not to choose to smoke, is not undermined by the imposition of liability upon cigarette companies.[17] That concern was reflected in Congress' decision not to ban cigarettes or cigarette advertising altogether, and to maintain uniform labeling. Congress recognized that liability under state tort law would continue to exist, and did nothing to immunize cigarette manufacturers from such liability. The argument that the imposition of such liability will jeopardize the entire cigarette industry, and with it the nation's economic well-being and its citizens' freedom of choice, is hypothetical and speculative at best. Indeed, even those claims based upon theories of strict products liability, may co-exist with an industry whose development and promotion are to be fostered by congressional action. *See Silkwood, supra*, 104 S.Ct. at 625–26. *A fortiori*, they exist where, as here, the industry upon which liability is to fall is one which Congress has found responsible for death and disease. In any event, as with nuclear power, the legislative history of the Federal Cigarette Labeling Act reveals a Congress unwilling to deprive individuals of their common law damage remedies, whatever they may be.[18]

---

**17.** The court notes that this is particularly true in light of the failure of prior cases of this sort. *See supra* at 1161–1162 (citing cases).

**18.** Defendants argue that plaintiff's risk-utility claims in particular are preempted in that, since such claims would enable juries to drive the cigarette industry out of business, they conflict with the congressional purpose to ensure the survival of the cigarette industry. *See O'Brien v. Muskin Corp., supra*, 94 N.J. at 184, 463 A.2d 298. This argument misconceives the nature of this claim: risk-utility is one method of taking the first step in deciding whether a strict liability analysis should be applied, by proving the existence of a defect. *O'Brien, supra*, 94 N.J. at 185–86, 463 A.2d 298. *See also Feldman v. Lederle Laboratories, supra*, 97 N.J. at 444 and n. 4, 479 A.2d 374. That method renders a manufacturer strictly liable for injuries suffered as a result of its product, irrespective of whether such manufacturer knew or should have known

of the product "defect." *See Feldman, supra*, at 450–51, 479 A.2d 374. However, the method also requires the assessment of many factors—the so-called "Wade factors"—including the reasonableness of the defendant's conduct in failing to improve the product (factor 4) and of the plaintiff's conduct in using it (factors 5 and 6). In particular, risk-utility analysis requires that the jury assess

> (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or the existence of suitable warnings or instructions.

*O'Brien, supra*, 94 N.J. at 182, 463 A.2d 298, quoting *Cepeda v. Cumberland Engineering Co.*, 76 N.J. 152, 174, 386 A.2d 816 (1978). Hence, reflected in risk-utility analysis is a set of principles traditionally associated with torts based upon negligence. *O'Brien, supra*, 94 N.J. at 181, 463 A.2d 298. More important, age-old notions

Second, as shown above, Congress manifested a deep concern over the possibility that different states or localities would impose different labeling or advertising requirements, thereby both imperiling the tobacco, advertising and related industries, and undermining the "comprehensive federal program" which it sought to implement. Of course, such uniformity would not necessarily be imperiled by a jury verdict against cigarette manufacturers, for such verdict might not result in a corresponding change in behavior on the part of the manufacturers; the choice would be theirs to make. Thus, in other areas in which federal labeling is mandated, or directed by federal agencies, as advertising is under the Act, 15 U.S.C. §§ 1335–36, state common law liability has nonetheless been allowed to survive. *See, e.g., Ferebee, supra,* 736 F.2d at 1540–52; *Feldman, supra,* 97 N.J. at 461, 479 A.2d 374, citing, *e.g., Brochu v. Ortho Pharmaceutical Corp.,* 642 F.2d 652, 658 (1st Cir.1981) (drug manufacturer liable under state tort law for failure to warn notwithstanding FDA approval of "uniform" label); [19] *Raymond v. Riegel Textile Corp.,* 484 F.2d 1025, 1026–28 (1st Cir.1973) (state products liability law applied notwithstanding standards promulgated in the Flammable Fabrics Act, 15 U.S.C. § 1191 *et seq.,* which, at that time, contained a broad preemption provision) (citing cases); *Hubbard-Hall Chemical Co. v. Silverman,* 340 F.2d 402, 405 (1st Cir.1965) (Department of Agriculture approved label did not preempt state tort action for failure to warn, in part because Congress had not occupied the field in this area). Underlying these deci-

sions, is the recognition that compensation for individuals as a result of an injury caused by particular products is not only a right that ought to be abridged only where Congress clearly intended to do so, *see Silkwood, supra,* 104 S.Ct. at 623; *id.* at 629 (Blackmun, J., dissenting); *Raymond v. Riegel Textile Corp., supra,* 484 F.2d at 1028, but also one that does not necessarily interfere with governmental regulation of such products. *See Silkwood, supra,* 104 S.Ct. at 626. Here, too, the notion that unless state common law claims are preempted, cigarette manufacturers will be subjected to multiple and conflicting standards with regard to labeling and advertising, is purely hypothetical. Plaintiffs may not prevail in these lawsuits and, if they do, manufacturers may not respond to such suits by altering their labels or changing their advertising practices. *See Ferebee, supra,* 736 F.2d at 1541. Viewed this way, the payment of compensation to victims of tortious activity on the part of defendants, if it is proved, does not necessarily, or even probably, conflict with the purposes of uniformity that underlie the Act, let alone jeopardize the survival of the tobacco industry.

Indeed, the payment of such compensation may further the remedial purposes of the Act, by, for example, aiding in the exposure of dangers not previously associated with cigarette smoking, encouraging manufacturers or consumers to petition Congress, the FCC or the FTC for reasonable regulatory changes, or itself pressuring Congress to act. *See Ferebee, supra,* 736 F.2d at 1541–42. Moreover, defend-

of assumption of risk, such as those about which Congress was concerned in debate, *see supra,* at 1162–1163, are contemplated in factor 6, quoted above. The argument then, that this type of analysis was outside the scope of congressional contemplation, is without merit. Congress abridged no common law cause of action whatsoever in passing the Act. That each such cause of action, and this one in particular, may prove injurious to the cigarette industry is a truism, but one that apparently did not bother Congress.

**19.** FDA approved warnings thus do not preempt state common law products liability claims *de-*

*spite* the preemptive effect that has generally been given the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq. See generally McDermott v. State of Wisconsin,* 228 U.S. 115, 131–32, 33 S.Ct. 431, 434–35, 57 L.Ed. 754 (1913); *National Women's Health Network v. A.H. Robins Co.,* 545 F.Supp. 1177, 1181 (D.Mass.1982); *Pharmaceutical Society of the State of New York, Inc. v. Lefkowitz,* 454 F.Supp. 1175, 1179 (S.D.N.Y.1978) (state labeling laws preempted to the extent they conflict with the Act) (dictum), *aff'd,* 586 F.2d 953 (2d Cir.1978); *Cosmetic, Toiletry & Fragrance Association, Inc. v. State of Minnesota, supra,* 440 F.Supp. at 1220–25.

ant's argument that, were the Act to result in added warnings, it would dilute the effectiveness of the warnings that now exist, thereby undermining the primary purpose of the Act, is without merit. Congressional concern was focused on a fear that such warnings would become encumbered with qualifications, and the message that cigarette smoking is dangerous be accordingly weakened. *See* S.Rep. No. 195, *supra*, at 4. Congress feared not stronger, but weaker statements; only the former would be encouraged by state tort recoveries.[20] Hence, even industry reaction to a finding of liability would not, in this sense, engender conflict with the Act.

In sum, the payment of compensation to injured individuals in no way creates an actual conflict with the Federal Cigarette Labeling Act, or Congress' goals in enacting it. As Congress has not occupied a field which encompasses common law causes of action, or explicitly stated that it intended to preempt such claims, the court cannot but find that such claims exist now, as they existed prior to passage of the Act. The legislative history of the Act, and its amendment, further confirms that Congress did not intend that such claims be preempted. These claims survive and continue to represent an individual's sole recourse in the event of injury based on cigarette smoking, should that injury be found to have resulted from manufacturers' tortious activity, whether that be in the manufacture, design, advertising or marketing of their undisputably harmful products. Congress did not, despite its solicitousness for the cigarette industry, deprive citizens of this recourse. Nor shall the court, in deference to Congress and with respect for the state common law and individuals' right to invoke it, do so.

## CONCLUSION

The arguments presented by the defendants in this case symbolize a common misperception of the function of government regulation and the imposition of standards of conduct which result. It would be inappropriate to conclude that what is not prohibited is permitted or that a minimum standard fixes the maximum as well. It is impossible for the government to codify every act which should not be done or the standards by which every act should be performed. Thus, government has frequently established standards in those areas in which a particular industry has failed to establish its own. But injuries to persons, property and the environment were wrong even before government declared that they were wrong.

Now that government has acted in many areas and decreed safety and quality standards, it would be unfortunate if those directed to do no less, assume that they need do no more. In almost every instance, government standards are meant to fix a level of performance below which one should not fall. However, legal minimums were never intended to supplant moral maximums. Nor were they intended to eliminate pride in quality and craftsmanship or self-imposed standards of health and safety.

In this case the tobacco industry argues that because the warning mandated by Congress prohibits them from doing less, they need not and cannot do more. The court here concludes that the warning of the Surgeon General fixes the minimum. Indeed, indications are that the Surgeon General himself does not view the warning as adequate. For these reasons, persons

---

**20.** The court notes in this regard that the House of Representatives has recently passed a measure that would mandate stronger warnings on cigarette packages; these four warnings would be placed on such packages on a rotating basis. In addition to complicating the entire warning scheme, three of these four warnings are longer than the body of the present labeling requirement. *See* 130 Cong.Rec. H9222 (Sept. 10, 1984) (text of H3979, § 4(a)(1)). The court recognizes

that this bill represents legislation which remains pending and is therefore of limited value in assessing even Congress' present inclination, let alone that of the Congress which passed the Act here under consideration. Still, the Bill demonstrates a diminished congressional concern with a simple or concise labeling scheme where such scheme does not accurately represent the dangers associated with smoking.

who claim that the warnings are not adequate and that they have been injured as a result should not be deprived of the opportunity of so proving. By this decision the court does not find that they will succeed, but only that they have the right to present their claims for adjudication.

Defendant's motion for judgment on the pleadings is denied. Plaintiff's motion to strike defendants' preemption defenses is granted. An appropriate order will issue.