213 N.J. Super. 51 (1987)
516 A.2d 277
JOSE ANDRE AND IRISABELA ANDRE, HIS WIFE, PLAINTIFFS,
v.
UNION TANK CAR COMPANY, INC.; "A" MANUFACTURING COMPANY, A FICTITIOUS NAME REPRESENTING A DEFENDANT WHOSE IDENTITY IS UNKNOWN TO PLAINTIFFS; "B" DISTRIBUTING COMPANY, A FICTITIOUS NAME REPRESENTING A DEFENDANT WHOSE IDENTITY IS UNKNOWN TO PLAINTIFFS, DEFENDANTS.
Superior Court of New Jersey, Law Division Union County.
Decided December 10, 1985.
Updated January 21, 1987.
*53 Leonard T. Bzura for plaintiffs (Forman, Forman, Cardonsky & Andril, attorneys).
John C. Heavey for defendant (Carpenter, Bennett & Morrissey, attorneys).
*54 SACHAR, J.S.C.
This failure-to-warn products liability case presents for consideration the effect of the Federal Railroad Safety Act, 45 U.S.C.A. § 421 et seq., and its preemptive effects, as well as the strict liability in tort duty to warn, placed on the manufacturer of a railroad tank car in the absence of any such federal preemption. The court concluded that under either federal preemption or strict tort liability, defendant owes no duty to plaintiffs under the facts of this case.
Plaintiffs, Jose and Irisabela Andre, instituted this action for damages resulting from Jose Andre's fall from a tank car manufactured by defendant, Union Tank Car Company (hereinafter referred to as Union). Jose Andre seeks damages for physical injuries, which he claims resulted from a defect in the tank car. Irisabela Andre, his wife, seeks damages for loss of consortium.
Jose Andre, an employee of Essex Chemical Co., Newark, N.J., (hereinafter referred to as Essex) was injured on the job when he fell from the top of a tank car on May 30, 1981. At the time of Andre's accident, he was a master mechanic with Essex. One of his responsibilities at Essex was to vent tank cars loaded with incoming chemicals to the plant. Venting is the process employed to relieve any internal pressure in the tank car and simultaneously permits air to enter the tank car as the tank car is being emptied of its cargo.
By way of background, Essex is a major chemical company. It conducts its operation through numerous plants. Essex's products are based on three principal materials: sulfur, phosgene and florine. The sulfur-based products are sulfuric acid, alum and liquid sulfur dioxide. The phosgene-based products, a highly toxic gas, is the base for another major product group called organic intermediates, and the third category, florine, is a toxic-containing gas. One florine reaction product is hydrogen floride, a highly corrosive acid. Essex's plant in Newark where Andre was employed produces the sulfur-based product group. *55 As a major chemical company, Essex employs numerous individuals to oversee that the commodities employed are properly handled, including chemical engineers and at least one safety engineer.
The sulfur used at the Newark plant comes from several sources. One such source is what is referred to as the frash process, in which underground sulfur is melted with hot water and pumped to the earth's surface; this fresh sulfur is not hazardous and does not produce any hazardous gas. Another such method of obtaining sulfur is by separating it from petroleum, coal or natural gas by chemical processing at the refinery. Sulfur obtained by the later process readily combines with a hydrogen source to produce hydrogen sulfide. Hydrogen sulfide is an extremely hazardous gas. It has the capacity to numb the sense of smell and based on the concentration level (parts per million (p.p.m.)), can cause dizziness, unconsciousness, cessation of respiration and death. According to the Material Safety Council, Handling Liquid Sulfur, toxic effects of hydrogen sulfide (Table 4.3), a concentration level of hydrogen sulfide between 500-700 p.p.m. will cause loss of consciousness and possible death within one-half to one hour and a concentration level of between 700-1,000 p.p.m. will cause rapid unconsciousness, cessation of respiration and death.
The tank car that Andre was venting contained sulfur, derived from petroleum. The shipper of the sulfur in question, Chevron, Alberta, Canada, knew that Canadian sulfur, derived from petroleum, contains approximately 200 to 500 p.p.m. hydrogen sulfide and that its sulfur may have contained substantially higher counts.
Further, at the time that Chevron loaded the tank car in Canada, there was every indication that the sulfur, being so loaded, was contaminated (capable of producing hydrogen sulfide). The contents of a companion tank car, sent by Chevron to Essex at approximately the same time, when tested, indicated a presence of hydrogen sulfide in a concentration in excess of 1,000 p.p.m., and sustained that level for at least fifteen minutes.
*56 After loosening the second of six bolts of the manway cover atop the tank car, Andre detected an unpleasant odor and immediately ran to the other side of the manway platform. The next thing he remembered, he was lying on the railroad tracks. Andre contends that the presence of hydrogen sulfide in the tank car caused him to lose consciousness and fall from the tank car. At the beginning of the trial, he alleged Union was responsible for his injuries, based on three theories: negligence, defective design of the tank car, and failure to warn of the danger present in the tank car. During trial, Andre voluntarily dismissed his claims of negligence and defective design, but proceeded on the issue that Union had an obligation to place some form of warning on the tank car to alert him to the potential danger of hazardous gas within the tank car.
The tank car in question, XTLCX-60983, was manufactured by Union and leased, along with five other tank cars, to Essex. These six tank cars were put into service by Essex in May 1981. All six tank cars were built to D.O.T. (Department of Transportation) specification 111A100W3, a standard tank car design recognized and accepted by the United States Department of Transportation (U.S.D.O.T.). The tank cars were approved by the A.A.R. (Association of American Railroad) Tank Car Committee for sulfur and for nonregulated commodities and commodities authorities in D.O.T. part 173 for which there are no special requirements and which are compatible with this class of car. The tank car was further certified to be in conformance with all applicable D.O.T. and A.A.R. requirements including, but not limited to, specifications, regulations, rules of interchange, and D.O.T. railroad safety appliance standards.
Union argues that it is prohibited from labeling its tank cars, except as specifically mandated by the federal regulations. In particular, D.O.T. specification 111A100W3 required Union to stencil on the side of the tank car dome, "not for flammable liquids."
Plaintiff argues that sulfur, according to the hazardous materials regulations of the U.S.D.O.T., is not hazardous and thus *57 there is no labeling or placarding requirement on the tank car to conflict with or to prevent Union from so labeling. The problem readily apparent to the court is that plaintiff failed to produce evidence indicating that the tank car was intended to carry only one type of sulfur or at least one type of commodity posing the same dangers. This tank car was constructed to carry numerous commodities, hazardous and nonhazardous. According to its specifications, the tank car was capable of carrying hazardous materials which include poisons, such as nitroaniline, phenol and potassium oxanide; corrosives, such as sodium hydroxide, spent mixed acid and sulfur chloride; and oxidigers, such as barium chlorade, calcium chlorade and sodium chlorade. In total, there were 63 hazardous commodities that this tank car was designed to carry. Another problem the court encountered was that this tank car was not designed to carry hydrogen sulfide, the alleged cause of plaintiff's injuries, which is subject to regulation by the Hazardous Materials Regulations, 49 C.F.R. § 172.101. Further evidence supporting the conclusion that the tank car was not limited to sulfur or commodities posing the same or similar dangers was the service agreement between Union and Essex.
The tank car in question was intended to be used in the United States, Canada and Mexico. According to the car service agreement, the lessee, Essex, could have loaned, let or sublet the tank car to its subsidiaries or affiliated companies, or to its consignees or suppliers in connection with the handling of commodities sold, bought or supplied for account of lessee, Essex. Additionally, there is no mention in the agreement that the use of the tank car was for sulfur or limited, in any respect, to any specific class of commodities, except as specified by D.O.T. regulations. The leased period for the tank car was five years, according to the service agreement, with an automatic renewal for an additional five-year period, unless notice requesting cancellation was received. This evidence lent support and credibility to the position that the requested placarding by plaintiff would pose a conflict with the federal regulatory scheme of warnings and placards mandated when certain hazardous materials would be carried in the tank car.
*58 Plaintiff's expert, Louis Howarth, a mechanical engineer, qualified as an expert in engineering and safety, but not as an expert in chemistry. He initially testified that there was a defect in the design of the tank car. He admitted that he had no prior experience with tank cars or railroading and had no knowledge of who, other than Union, manufactured tank cars. He alleged the tank car was defectively designed in its failure to remove the hydrogen sulfide from the tank car through a ventilation system with a vacuum hose which would pull fumes down into a catalytic exchanger away from those unloading the tank cars. Admittedly, this device, which he alone devised in theory, exists nowhere in the world. He then went on to put the duty of creating such a device and applying it on Essex and not on the tank car's manufacturer, Union.
On the issue of labeling and warnings, Howarth opined that a label should have been placed on the dome of the tank car to the effect that it contained toxic gases, may contain hydrogen sulfide, the need for a respirator, and an international symbol of a skull and crossbones. He testified that this label should have been placed on the tank car by the shipper, Chevron, and the manufacturer, Union. His opinion was based on his assertion that the tank car was designed exclusively for nonregulated commodities. He stated that he only knew that it was designed to carry sulfur. Further, he stated that the designer was in the best position to put these labels on the car and that no government regulation prohibited it.
Defendant's expert, Fred Schwartz, Jr., testified that the shipment of hydrogen sulfide was an illegal shipment involving the shipment of a regulated commodity with a nonregulated material. He also testified that no manufacturer in the tank car business puts such warnings as proposed by Howarth on tank cars. Both he and defendant's other expert, George Stanton, maintained that a warning that is not necessarily applicable is not only contrary to applicable D.O.T. and O.S.H.A. regulations, but results in the obfuscation of warnings when needed. On cross-examination, plaintiff did not challenge *59 defendant's experts' contentions of the multiple uses that the tank car could be put to. Both of defendant's experts stated that the tank car was not the problem but that the contents of the tank car produced the problem. Schwartz testified that a temporary label could have been placed on the shipment by the shipper, in this case Chevron, who knows from its experience the contents thereof, as well as by Essex, which would keep information as to the nature of the product being shipped. According to the National Safety Council data sheet on Handling Liquid Sulfur, the amount of hydrogen sulfide present in any given shipment of sulfur can be predicted by the unloader on the basis of past experience with sulfur from the same source.
As previously stated, the use of the tank car was not limited to sulfur during the lease period. Chevron processed the sulfur and loaded it into the tank car. It knew that its sulfur contained hydrogen sulfide and Essex knew or should have also known of the presence of hydrogen sulfide. Defendant in this case merely supplied the container to carry the commodity. It had no knowledge of the presence of hydrogen sulfide or any other danger which could be present in the tank car until the tank car was actually loaded. Admittedly, Union did not load, carry or unload the tank car in question.

I.

Federal Preemption.
Congress, through the Federal Railroad Safety Act, has evinced its intent, to the extent possible, to preempt state action in the field of railroad safety, as it pertains to placarding and labeling of tank cars, thus prohibiting Union from placing the additional warnings and labels sought by plaintiff on its tank cars. Support for this position is readily found. The Hazardous Materials Transportation Act, codified at 49 C.F.R. § 171-179, classifies more than 1,500 hazardous materials and prescribes in detail the proper packaging, labeling, loading and handling of shipments by rail and other means of transport. See Atchison, T. & S.F. Ry Co. v. Ill. Com. Com'n, 453 F. Supp. 920, 923 (D.Ill. 1977). And more particularly, under 49 *60 C.F.R. § 172.401, 172.500, labeling and placarding of a danger is prohibited if that hazard is not present within the tank car.
The legislative intent further indicates that the regulations are to apply to:
... (p)ersons who offer hazardous materials for transportation (shippers), those who transport the materials (carriers), and those who manufacture and retest the packagings and other containers intended for use with the materials. The scope of transportation activity affected includes: packaging of shipments of hazardous materials; package markings (to show content) and labeling (to show hazard); vehicle placarding (to show hazard); handling procedures, such as loading and unloading requirements; routing; care of vehicle and lading during transportation; preparation and use of shipping papers to show the identify, hazard class and amount of each hazardous material being shipped; and requirements for reporting any unintentional release of a hazardous material during transportation. [50 Fed.Reg. 20,872 (1985)]
The clear intent of Congress in the hazardous materials regulations is to classify those items which pose a danger, identify the danger and specify exactly what warnings and precautions need be taken to protect against harm. The legislative intent was to preclude a multiplicity of state or local regulations and the potential for varying as well as conflicting regulations in the area of hazardous materials transportation. S.Rep. No. 1192, 93rd Cong., 2nd Sess. 37 (1974). Also clear from the federal regulations is that they specify that the shipper is the proper party to appreciate the danger posed by the commodity shipped. 49 C.F.R. § 172.400(a), § 172.401, § 172.500(a).
The court has taken note that in the Inconsistency Ruling (I.R.) 2, 6, 8 and 15, the department stated its view that:
... the shipping paper requirements of the H.M.R. are exclusive and that any additional shipping paper requirements are inconsistent under the H.M.T.A. Furthermore, when shipping papers contain information relating to hazard class definitions other than those in the H.M.R., the resulting confusion can lead to deviations from DOT's uniform hazard warning systems. This, in turn, can have detrimental effects during emergency response operations. [I.R. 16, 50 Fed.Reg. at 20,875]
As addressed in I.R. 16, under the hazardous materials regulations, carriers are notified of the presence of federally regulated materials through shipping papers, placards and certifications of compliance which originate with the shipper and accompany the cargo to its destination (49 C.F.R. § 172). 50 Fed. Reg. at 10,875. Additionally, carriers must rely on the shippers *61 for information about the cargo. Ibid. The shipper had an obligation to warn of any dangers, based on the commodity it shipped and an obligation is also placed on the purchaser to test the commodity so shipped.
The federal regulatory scheme views this as the best mode of protecting those who will, under normal and emergency conditions, handle the commodity shipped. In essence, therefore, this product is a hollow cylinder designed to carry numerous commodities. It poses no danger until a commodity is placed within it. From that point forward, the risks presented can be identified and properly protected against, not before. In Feldman v. Lederle Laboratories, 97 N.J. 429 (1984), the court stated, "A warning that a product may have an unknowable danger warns one of nothing." Id. at 454. In the case at bar, the hydrogen sulfide was the dangerous product to be guarded against, not the container. The container had multiple foreseeable uses.
The Federal Railroad Safety Act provides, in pertinent part:
§ 434 National Uniformity of laws, rules, regulations, orders and standards relating to railroad safety state regulation. The Congress declares that laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force any law, rule, regulation, order, or standard relating to railroad safety until such time as the Secretary has adopted a rule, regulation, order or standard covering the subject matter of such State requirement. A State may adopt or continue in force an additional or more stringent law, rule, regulation, order, or standard relating to railroad safety when necessary to eliminate or reduce an essentially local safety hazard, and when not incompatible with any Federal law, rule, regulation, order or standard, and when not creating an undue burden on interstate commerce. [45 U.S.C.A. § 434; emphasis supplied]
As expressed in § 434, the primary objective of the act is to establish a nationally uniform system in the rail safety field. That section (§ 434) specifically authorizes a narrow spectrum of deviation from national uniformity, that being for a specific state or local hazard requiring deviation from a uniform scheme. 1970 U.S.Code Cong. & Ad.News (91 Stat.) 4104, 4110-4111; Donelon v. New Orleans Terminal Co., 474 F.2d 1108, 1111 (5 Cir.1973). Unquestionably, the intent of Congress, as evidenced by its regulations, was to preempt state activity *62 relating to railroad safety to the extent possible. NARUC v. Coleman, 542 F.2d 11, 13 (3 Cir.1976).
To determine whether plaintiffs' claim is in conflict with the federal scheme, a two prong test is employed. See Ray v. Atlantic Richfield, 435 U.S. 151, 158, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978). This test, incorporated into 49 C.F.R. § 107.109(c), provides: (1) whether compliance with both the state or local requirement and the act or the regulations issued under the act is possible; and (2) the extent to which the state or local requirement is an obstacle to the accomplishment and execution of the act and the regulations issued under the act.
The first criterion known as the "dual compliance test" concerns those state or local requirements that are incongruous with federal requirements; that is compliance with the state or local requirement causes the federal requirement to be violated, or vice versa. The second criterion, known as the "obstacle test," essentially subsumes the first criterion and concerns those state or local laws that, regardless of conflict with a federal requirement, stand as an obstacle to the accomplishment and execution of the Hazardous Materials Transportation Act and the regulations issued under it. 50 Fed.Reg. 20,873 (1985).
In Brown v. Hotel Employees, 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984), the Court held:
When federal preemption is invoked under the directive of the Supremacy Clause, it falls to this court to examine the presumed intent of Congress. (citations omitted). Our task is quite simple if, in the federal enactment, Congress has explicitly mandated the preemption of state law, (citation omitted), or has adequately indicated an intent to occupy the field of regulation thereby displacing all state laws on the same subject (citation omitted). Even in the absence of such express language or implied Congressional intent to occupy the field, we may nevertheless find state law to be displaced to the extent that it actually conflicts with federal law. Such actual conflicts between state and federal law exists when compliance with both federal and state regulations is a physical impossibility, (citation omitted), or when state law stands as an obstacle to the accomplishment and objectives of the full purposes and objectives of Congress. [468 U.S. at 499-500, 104 S.Ct. at 3185-86, 82 L.Ed.2d at 382-83].
In Brown, appellants argued that the appropriate framework for preemption analysis in this case, that being the interests of *63 the National Labor Relations Act, 29 U.S.C.A. § 141 et seq., and the New Jersey Casino Control Act, N.J.S.A. 5:12-1 et seq., calls for a balancing test applied to those state laws which fall within the so-called local interests exception to the preemption doctrine first set forth in San Diego Building Trades Council v. Garmon, 359 U.S. 236, 243-244, 79 S.Ct. 773, 778-779, 3 L.Ed.2d 775 (1959). Brown, supra, 468 U.S. at 501, 104 S.Ct. at 3185, 82 L.Ed.2d at 383. In its analysis, Brown concludes a presumption of federal preemption applies even when the state law regulates conduct only arguably protected by federal law. 468 U.S. at 502, 104 S.Ct. at 3186, 82 L.Ed.2d at 384. This presumption of federal preemption admits to exception when unusually deep rooted local interests are at stake. Ibid. If the state law regulates conduct that is actually protected by federal law  preemption follows  as a matter of substantive right. 468 U.S. at 502, 104 S.Ct. at 3186, 82 L.Ed.2d at 384. See also Silkwood, Administrator of the Estate of Silkwood v. KerrMcGee Corp., et al., 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), petition for reh'g den. 465 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 754 (1984).
In Cipollone v. Liggett Group, 593 F. Supp., 1146 (D.N.J. 1984), the court addressed the issue of preemption in the context of a claim that the federal cigarette labeling act, 15 U.S.C.A. § 1331 et seq., preempts the state common law claims asserted by plaintiff. Admitted was that the common law is as susceptible of preemption as are state statutes or regulations. Id. at 1151. Cipollone, citing San Diego Building Trades Council v. Garmon, 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959) held that the clear intent of our Supreme Court was as follows:
[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be a potent method of governing conduct and controlling policy. Even the States' salutary effort to redress private wrongs or grant compensation for past harm cannot be exerted to regulate activities that are potentially subject to the exclusive federal regulatory scheme. [Cippolone, 493 F. Supp. at 1151].
In Cipollone, plaintiff was dying of lung cancer. She brought a products liability action against three cigarette companies, *64 alleging that they were responsible for her current state.
On defendant's motion for judgment on the pleadings, the court held that the Federal Cigarette Labeling and Advertising Act did not expressly or impliedly preempt plaintiff's cause of action based on the essential purposes of the act. The court concluded the purposes are essentially two: first, Congress intended to ensure the continued vitality of the tobacco industry, and two, Congress sought to make uniform the labeling and advertising requirements imposed upon cigarette manufacturers. Id. at 1166.
The District Court in Cipollone held it would be inappropriate to conclude that what is not prohibited is permitted or that a minimum standard fixes the maximum as well. Id. at 1170. This statement sums up the positions of the parties to the present litigation. In the matter at bar, plaintiff, in essence, states since the Federal Railroad Safety Act does not require a warning to be placed when transporting sulfur, then a warning should have been placed by Union, and defendant states since the regulations do not require a warning when transporting sulfur and since the tank car's use was not limited to transporting sulfur they are prohibited from so warning. In reviewing the legislative history of the Federal Cigarette Labeling and Advertising Act, the District Court in Cipollone concluded that the warnings to be placed on cigarette packages were intended to fix a minimum standard, not a maximum, id. at 1170, and that no conflict exists, express or implied and the purpose of the act would not be frustrated by the imposition of a state standard in a damage action. Id. at 1166. The Third Circuit reversed, holding with respect to labeling that:
(T)he duties imposed through state common law damage actions have the effect of requirements that are capable of creating `an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' (citations omitted).... Applying this principle, we conclude that *65 claims relating to smoking and health that result in liability for noncompliance with warning, advertisement, and promotion obligations other than those prescribed in the Act have the effect of tipping the Act's balance of purpose and therefore actually conflict with the Act.
(10) Based on the foregoing, we hold that the Act preempts those state law damage actions relating to smoking and health that challenge either the adequacy of the warning on cigarette packages or the propriety of a party's actions with respect to the advertising and promotion of cigarettes. We further hold that where the success of a state law damage claim necessarily depends on the assertion that a party bore the duty to provide a warning to consumers in addition to the warning Congress had required on cigarette packages, such claims are preempted as conflicting with the Act. Cipollone v. Liggett Group, Inc., 789 F.2d 181, 187 (3rd Cir.1986), cert. denied, 479 U.S. ___, 107 S.Ct. ___, 93 L.Ed.2d ___ (1987).
In the case at bar, even if there is no express preemption of this common law action, preemption implied from legislative intent may be inferred to arrive at this conclusion. Three questions can be asked: First, is there a pervasive scheme of federal regulations in the area; second, is the federal intent in such area dominant; and third, do the objectives of the federal law in the area and the obligations imposed by it reveal the same purpose. Cipollone v. Liggett Group, supra, at 1163-64. The court, in reviewing the legislative history of the Federal Railroad Safety Act and the hazardous materials regulations concludes that it can readily be inferred that this state action would pose, at a minimum, an obstacle to the intent of the federal regulatory scheme.
In enacting the Hazardous Materials Transportation Act, Congress recognized the department's efforts in hazardous materials transportation regulation lacked coordination by being divided among the various transportation modes and lacked *66 completeness because of gaps in departmental authority, most notably in the area of manufacturing and preparation of packaging used to transport these materials. In order to protect the nation adequately against the risks of life and property which are inherent in the transportation of hazardous materials in commerce, Congress consolidated and expanded the department's regulatory and enforcement authority. 49 U.S.C.A. § 1801; 50 Fed.Reg. 20,873.
To allow the state common law action to survive in this case would, in essence, provide the state with an expansion of its regulatory authority, allowing a new reservoir of differing and possibly incompatible railroad safety laws. Consol. Rail Corp. v. Pennsylvania Pub. Util., 536 F. Supp. 653, 656 (E.D.Pa. 1982), aff'd 696 F.2d 981 (3 Cir.1982). This would run counter to Congress's purpose in establishing a uniform national regulatory scheme. It is contrary to Congress's purpose in passing the Railroad Safety Act to allow the states to reoccupy the fields from which they previously had been displaced. Id. at 656-657. If juries throughout the 50 states were allowed in these types of cases to adjudicate the need for permanent warnings to be placed on tank cars for each foreseeable commodity that could be contained therein, the tank cars would become travelling billboards.
Nor can plaintiff's claim be sustained under the "local hazard" exception to the statute. As stated in NARUC v. Coleman, supra, the local hazard exception was designed to enable the states to respond to local situations, which are not statewide in character and not capable of being adequately encompassed within uniform national standards. Id. at 14-15.
In view of the federal statute and regulations, the state is preempted under the circumstances of this case.

II.

Strict Liability In Tort.
After viewing all the evidence presented, the court finds that even under the theory of strict tort liability for failure to *67 warn, liability cannot attach to Union for plaintiff's resulting injuries. The first rule for imposing strict liability is promotion of safety. If the placing of a warning would detract from safety and create a more dangerous result, such a duty cannot be imposed as a matter of law.
As expressed in Campos v. Firestone Tire & Rubber Co., 98 N.J. 198 (1984):
The duty to warn in the strict liability cause of action is based on the notion that absent a warning or adequate warning, a product is defective, in that it is not reasonably fit, suitable, or safe for its intended purposes. Freund v. Cellofilm Properties, Inc., 87 N.J. 229, 242 (1981). In testing the need and adequacy of a warning, the manufacturer is deemed to know the dangerousness of the product. It is with that knowledge assumed that the manufacturer's conduct is to be gauged. Feldman, supra, 97 N.J. [429] at 450; Freund, supra, 87 N.J. at 240.... [at 205].
Contrary to plaintiff's contention, to cause a manufacturer to place permanent labels on a tank car without regard to the permissible content would in itself constitute a defect and would render the tank car unuseable for its intended purpose.
While plaintiff's expert predicated his position upon the tank car being designed exclusively for nonregulated commodities, there is no such limitation contained in the lease agreement or the specifications of the manufacturer of this tank car. The court must consider, in balancing the competing interests presented, the applicable federal rules and regulations with respect to the foreseeable uses that the tank car could be put to. As stated in Suter v. San Angelo Foundry & Machine Company, 81 N.J. 150, 169 (1979), Cepeda extended strict liability to include not only intended but also foreseeable uses of the product.
The use of a permanent label as to each product that could foreseeably be contained in this tank car would create the billboard effect alluded to previously. To warn of all potential dangers would warn of nothing. Not only would such permanent labeling conflict with the federal regulations as to hazards, but it would detract from the effectiveness of a temporary relevant notice which could be placed on the tank car at the time of shipment.
*68 In evaluating the existence of a duty to warn, the court must consider the factors set forth in Campos, supra:
Whether a duty exists "involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." Goldberg v. Housing Auth., 38 N.J. 578, 583 (1962). The additional cost of a warning will in most cases have but a slight impact on the risk-utility analysis, since such cost would generally have little, if any, effect on a product's utility. Freund, supra, 87 N.J. at 238 n. 1, 242; see also Cepeda v. Cumberland Eng'g Co., 76 N.J. 152, 174 (1978) (listing risk-utility factors). More relevant questions in the warning context include the following. Is the lack of the warning consonant with the duty to place in the stream of commerce only products that are reasonably safe, suitable, and fit? Will the absence of a duty encourage manufacturers to eliminate warnings or to produce inadequate warnings? Is the danger so basic to the functioning or purpose of the product  for example, the fact that a match will burn  that a warning would serve no useful purpose? [98 N.J. at 207-208]
The answer to the above is clearly that the manufacturer does not promote safety in putting such single-purpose permanent warnings on a tank car. It was not possible for Union to place warnings on the tank car that would have application to all uses that the tank car could be used for. Accordingly, it was reasonable for Union to expect the shipper to affix the appropriate warnings to the car, in accordance with trade custom. See Schipper v. Levitt, 44 N.J. 70, 99 (1965), in which the Court absolved the manufacturer of a water heater of liability for plaintiff's burns when it found that it was more practical for the plumber to install a necessary safety device. The Court noted that in developing steps toward higher user protection, the law should view trade relations realistically rather than mystically.
As a sophisticated user, manufacturer and seller of sulfur-based products, Essex knew or should have known of the potential for the presence of hydrogen sulfide in shipments of sulfur it received. If Essex received shipments of sulfur from Chevron before May 30, 1981, it should have kept and consulted records of the levels of hydrogen sulfide before it directed Andre to vent the shipment in question. If the shipment in question was the first it received from Chevron, Essex should have contacted the supplier to determine the likelihood of the presence of hydrogen sulfide contamination in the shipment.
*69 Since Essex should have known of the possible presence of hydrogen sulfide in the shipment of sulfur, it should have made a respirator available for Andre's use during the unloading process (as it did after the accident). In failing to do so, Essex violated 29 C.F.R. § 1910.134, which states that "respirators shall be provided when such equipment is necessary to protect the health of the employee...."
Defendant's expert testimony that manufacturers of tank cars do not put permanent labels, as proposed by plaintiff, on their tank cars and that such labeling would prohibit the sale of tank cars in the industry is consonant with the manufacturer's duty to comply with the federal regulations that are applicable thereto, as well as the safety precepts heretofore enunciated by the court.
In Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386 (1982), the Court stated:
... A defendant may be held strictly liable for injuries caused by a product which was defectively designed in that it did not contain an adequate warning of the product's dangers. Beshada [v. Johns-Manville Products Corp.] 90 N.J. at 208-209; Freund [v. Cellofilm Properties Inc.], 87 N.J. at 239-41. At the core of our strict liability cases is the requirement that the risk from the product be reduced to the greatest extent possible without hindering its utility. Beshada, 90 N.J. at 201. .. . A duty to warn of dangers inherent in a product's use arises because a warning could make [the product] safer at virtually no added cost and without limiting its utility. Id. at 201-202, citing Freund, 87 N.J. at 242. [at 402].
It is axiomatic that the duty to warn must relate to the danger to be warned of. Contrary to plaintiff's contention, to cause Union to place warning labels on its tank cars without regard to the permissible contents would increase the risk and decrease its utility.
Even without reference to D.O.T. regulations on labeling and placarding, it is evident that Union acted reasonably in marketing the tank car as it did. The tank car was but one component of the system for delivering the sulfur from Chevron to Essex. Chevron processed the sulfur and loaded it into the tank car. Union provided the shipping container. Essex operated the unloading phase of the system.
*70 As stated by the Court in Feldman v. Lederle Laboratories, supra:
When the strict liability defect consists of an improper design or warning, reasonableness of the defendant's conduct is a factor in determining liability. See Suter [v. San Angelo Foundry & Machine Co.], supra, 81 N.J. [150] at 171, Cepeda [v. Cumberland Engineering Co.], supra, 76 N.J. [152] at 171-72; Torsiello v. Whitehall Laboratories, 165 N.J. Super. 311, 320 n. 2 (App.Div.), certif. denied, 81 N.J. 50 (1979). The question in strict liability design-defect and warning cases is whether, assuming that the manufacturer knew of the defect in the product, he acted in a reasonably prudent manner in marketing the product or in providing the warnings given. Thus, once the defendant's knowledge of the defect is imputed, strict liability analysis becomes almost identical to negligence analysis in its focus on the reasonableness of the defendant's conduct. In Cepeda, supra, 76 N.J. at 172, and Suter, supra, 81 N.J. at 171, we quoted approvingly Prosser's treatise on torts: "Since proper design is a matter of reasonable fitness, the strict liability adds little or nothing to negligence on the part of the manufacturer * * *." W. Prosser, Law of Torts 659 n. 72 (4th ed 1971). [97 N.J. at 451]
In McQuaid v. Burlington County Memorial Hospital, et al., 212 N.J. Super. 472 (App.Div. 1986), the Court held that evidence that Ayerst Laboratories changed the contents of its package insert because of a request by the FDA was relevant in assessing the reasonableness of defendant's conduct in accordance with Feldman, supra. (Also see Footnote 1 in McQuaid with query as to whether the FDA action did not provide Ayerst with an absolute defense.)
The court holds that reasonable minds could not differ that the manufacturer acted in a reasonably prudent manner under the facts of this case.
For the reasons stated, defendant's motion for judgment at the conclusion of the case was granted.